STATE OF NORTH CAROLINA v. ROBERT BACON, JR.

No. 209A91

(Filed 29 July 1994)

1. **Criminal Law § 109 (NCI4th)— first-degree murder— defense psychiatrist—written report—required to be disclosed to prosecutor**

    The trial court did not err in a resentencing for first-degree murder by requiring a defense psychiatrist to compile a written report of his evaluation of defendant and submit it to the district attorney where the court's order provided no more than the reciprocal discovery requirements under N.C.G.S. § 15A-905(b). The trial court merely addressed the district attorney's concern that the expert would examine the defendant and never prepare a written report, thus hindering the State's ability to cross-examine

**STATE v. BACON**

[337 N.C. 66 (1994)]

the expert, and the court ensured fairness to both sides in the preparation of their case by stating that defense counsel must prepare a report if the expert's examination was to be used at trial. N.C.G.S. § 15A-903(e).

**Am Jur 2d, Depositions and Discovery §§ 462 et seq.**

2. **Constitutional Law § 342 (NCI4th)— first-degree murder— bench conferences—defendant represented by counsel— mechanical aspects of proceeding**

Defendant failed to demonstrate that his rights under Article I, Section 23 of the North Carolina Constitution as well as the Sixth and Fourteenth Amendments to the United States Constitution were violated at a resentencing hearing for first-degree murder where the court had granted an amended defense motion to record conferences or discussions in chambers when the defense indicated it was necessary and the record indicates that the trial judge conducted numerous bench conferences with counsel in which defendant did not participate. However, nothing indicates that defendant was not present in the courtroom, the court received no evidence during these conferences, most of these conferences concerned mechanical aspects of the proceedings, defendant could observe the context of each conference and inquire of his counsel concerning the substance of the conferences, nothing in the record demonstrates how defendant's presence would have served any useful purpose, and defendant does not demonstrate how the conferences impinged upon his opportunity to defend.

**Am Jur 2d, Criminal Law §§ 692 et seq., 901 et seq.**

**Accused's right, under Federal Constitution, to be present at his trial—Supreme Court cases. 25 L. Ed. 2d 931.**

3. **Criminal Law § 483 (NCI4th)— first-degree murder— resentencing hearing—communications between bailiff and clerk and jury—administrative**

There was no error in a resentencing hearing for first-degree murder where the court ordered the bailiff to engage in unrecorded communications with the prospective jurors and the trial jury and the clerk also communicated with the jury. The challenged communications were of an administrative nature, did not relate to the consideration of defendant's guilt or innocence, the subject

matter in no way implicated defendant's confrontation rights, and defendant's presence did not bear a reasonably substantial relation to his opportunity to defend.

**Am Jur 2d, Trial §§ 1568-1572.**

4.  **Constitutional Law § 344 (NCI4th)— first-degree murder—jury selection—court's communication with prospective juror**
    There was no prejudicial error during jury selection for a resentencing hearing in a first-degree murder prosecution where the trial judge engaged in an unrecorded communication with a prospective juror. The record indicates not only that the trial court reconstructed the substance of the bench conference with the prospective juror, which involved deferment of her service, but also that defense counsel consented to the bench conference and that he did not object to the court's decision to excuse the juror.

    **Am Jur 2d, Criminal Law §§ 695, 696.**

    **Validity of jury selection as affected by accused's absence from conducting of procedures for selection and impaneling of final jury panel for specific cases. 33 ALR4th 429.**

5.  **Evidence and Witnesses § 2873 (NCI4th)— first-degree murder—resentencing—defense psychiatrist—cross-examination—opinion that defendant dangerous**
    The trial court did not err during a resentencing hearing in a first-degree murder prosecution by allowing the district attorney to cross-examine defendant's expert psychiatrist as to whether defendant was dangerous where the psychiatrist had testified on direct examination that defendant suffered from an impaired capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law and that defendant stabbed the victim while under the influence of a mental or emotional disturbance. Defendant had introduced videotaped depositions of defendants' friends who depicted defendant as someone who would not kill another human being and defendant subsequently requested and the court submitted a nonstatutory mitigator that the character, habits, mentality, propensities, and activities of the defendant indicate that he is unlikely to commit another violent crime. North Carolina Rules of Evidence permit

broad cross-examination of expert witnesses and the cross-examination here plainly rebuts the evidence in support of the nonstatutory mitigator concerning the likelihood that defendant would not commit another violent crime. N.C.G.S. § 8C-1, Rule 611(b).

**Am Jur 2d, Witnesses §§ 471 et seq.**

6. **Evidence and Witnesses § 2954 (NCI4th); Criminal Law § 441 (NCI4th)— first-degree murder—defense psychiatrist—cross-examination—compensation**

The trial court did not err during a resentencing hearing in a first-degree murder case by allowing the district attorney to cross-examine a defense psychiatrist concerning his compensation or by permitting the district attorney to argue that the jury should view the expert's testimony with caution because of the financial arrangement. The district attorney properly cross-examined the psychiatrist concerning his forensic practice, his possible bias, and his status as a paid witness, and properly argued to the jury the importance of that testimony from the State's perspective.

**Am Jur 2d, Witnesses §§ 471 et seq., 554.**

7. **Criminal Law § 818 (NCI4th)— first-degree murder—resentencing—defense psychiatrist—interested witness instruction**

There was no plain error in a resentencing hearing for a first-degree murder in which the defense presented the testimony of a psychiatrist and where the court gave an interested witness instruction because there were several other reasons the two statutory mitigating circumstances noted by defendant might not have been found.

**Am Jur 2d, Trial §§ 855 et seq.**

8. **Constitutional Law § 314 (NCI4th)— first-degree murder—resentencing—effectiveness of counsel—references to parole**

Defense counsel did not act unreasonably and ineffectively in a resentencing for first-degree murder by presenting videotaped depositions from defendant's former friends and neighbors that contained explicit or implicit references to parole. The testimony in question involved the witnesses' willingness to welcome

defendant into their home or community if he was convicted and later paroled, and was in the context of defendant's friends and their unchanged favorable view of defendant.

**Am Jur 2d, Criminal Law §§ 752, 985-987.**

**Modern status of rules and standards in state courts as to adequacy of defense counsel's representation of criminal client. 2 ALR4th 27.**

9. **Jury § 141 (NCI4th)— first-degree murder—resentencing—jurors not examined concerning parole—no error**

The trial court did not err in a resentencing hearing for a first-degree murder by refusing to allow defendant to examine prospective jurors concerning their views on parole. Such questioning is irrelevant under the facts of this capital resentencing.

**Am Jur 2d, Jury § 197.**

10. **Constitutional Law § 314 (NCI4th)— first-degree murder—resentencing—evidence of prior death sentence—not ineffective assistance of counsel**

Defense counsel did not provide ineffective representation in a resentencing for first-degree murder where counsel mentioned in defendant's closing argument that defendant comes from a loving family and that the courtroom contained several family members during his first sentencing, but that the same family members were not able to attend this hearing due to financial considerations and work conflicts, and that it should be no surprise that defendant's mother was not present because she had had to hear the judge impose a death sentence at the first hearing. This argument was a matter of trial tactics to explain the absence of defendant's mother; moreover, mere knowledge by the jurors of the prior death sentence demonstrates no prejudice to the defendant.

**Am Jur 2d, Criminal Law §§ 752, 985-987.**

**Modern status of rules and standards in state courts as to adequacy of defense counsel's representation of criminal client. 2 ALR4th 27.**

11. **Criminal Law § 436 (NCI4th)— first-degree murder—resentencing—prosecutor's closing argument—future dangerousness—brutality—no error**

There was no error in a resentencing for first-degree murder where the prosecutor argued the brutal nature of the killing and

that defendant is dangerous despite the fact that the especially heinous, atrocious or cruel aggravating circumstance could not be considered because it had been submitted and not found by the jury at the first trial. The district attorney's argument that defendant was dangerous was based on testimony by defendant's own psychiatrist; the district attorney plainly stated that there was only one aggravating circumstance, pecuniary gain; the trial court instructed on and submitted only pecuniary gain; and neither the district attorney nor the trial judge ever mentioned the especially heinous, atrocious, or cruel aggravator.

**Am Jur 2d, Trial §§ 218 et seq.**

**Prejudicial effect of prosecutor's comment on character or reputation of accused, where accused has presented character witnesses. 70 ALR2d 559.**

12. **Criminal Law § 454 (NCI4th)— first-degree murder—resentencing—prosecutor's argument—death sentence justified by act of murder**

A prosecutor's closing argument in a first-degree murder resentencing was not so grossly improper as to require the trial judge to intervene *ex mero motu* where the prosecutor asked the jurors "Can you say he doesn't deserve the same thing that he imposed?" and "Do you think that he deserves any less for what he did now that he's had a fair trial than the sentence that he imposed and should he get any less than that?"

**Am Jur 2d, Trial § 229.**

13. **Criminal Law § 452 (NCI4th)— first-degree murder—resentencing—prosecutor's argument—weighing of factors**

There was no error in a resentencing for a first-degree murder where defendant contended that the district attorney asked rhetorical questions about each of the mitigating circumstances and improperly suggested that the jury weigh the aggravating circumstance against the mitigating circumstances one on one and not consider the aggravating circumstances as a group. The district attorney's approach was to argue each mitigating circumstance separately, the district attorney explained to the jury that viewing the mitigating and aggravating circumstances is not a counting process and that the aggravating circumstance is to be weighed against the mitigating circumstances, and the trial court

correctly charged the jury regarding the weighing process it was required to undertake.

**Am Jur 2d, Trial § 229.**

**14. Criminal Law § 454 (NCI4th)— first-degree murder— resentencing—prosecutor's argument—impaired capacity**

There was no error in a resentencing hearing for first-degree murder where the district attorney argued that the jury should not find the impaired capacity mitigating circumstance. It is for the jury to decide how much weight to give each mitigating circumstance and the district attorney may argue the evidence that the jury should consider when determining whether to find a certain mitigating circumstance.

**Am Jur 2d, Trial § 229.**

**15. Criminal Law § 439 (NCI4th)— first-degree murder— resentencing—prosecutor's argument—psychiatric testimony—no error**

There was no prejudicial error in the district attorney's argument concerning defendant's psychiatric testimony in a first-degree murder resentencing where the psychiatrist testified that 90% of the patients he examines in his forensic work have psychiatric problems and the district attorney stated in his argument that the witness found that 90 percent of the people he examines have some kind of a psychiatric problem. This misstatement, if it is a misstatement, was harmless in light of the trial court's instruction that counsel's statements were not evidence.

**Am Jur 2d, Trial §§ 218 et seq.**

**16. Criminal Law § 425 (NCI4th)— first-degree murder—sentencing—prosecutor's argument—professional organizations of defense expert**

There was no error in a first-degree murder resentencing where, although defendant contended that the district attorney spoke of facts not in evidence when he stated that many of the organizations to which the witness belonged require only a membership fee, the prosecutor properly drew the jurors' attention to the failure to establish any membership qualifications for these organizations.

**Am Jur 2d, Trial §§ 258, 259.**

**17. Criminal Law § 464 (NCI4th)— first-degree murder— resentencing—prosecutor's closing argument—lack of evidence of early admission or cooperation**

There was no gross impropriety in the closing argument of a resentencing hearing for first-degree murder where the prosecutor stated that there was no evidence to support the mitigating circumstance that defendant had admitted his involvement at an early stage in the proceedings or had cooperated with law enforcement officers when defendant had made an inculpatory statement following the killing. The argument was not grossly improper and the trial court charged the jurors that closing statements do not constitute evidence.

**Am Jur 2d, Trial §§ 258, 259.**

**18. Criminal Law § 464 (NCI4th)— first-degree murder— resentencing—prosecutor's closing argument—no history of violent behavior—no prejudice**

There was no prejudice in a resentencing hearing for first-degree murder where the prosecutor argued that the jury should refrain from finding that defendant had no history of violent behavior by referring to a defense psychiatrist's testimony that defendant had told him about an earlier conflict. The trial court cautioned the jurors to consider the evidence only for the purpose of explaining or supporting the psychiatrist's opinion and the jury found the mitigating circumstance.

**Am Jur 2d, Trial §§ 258, 259.**

**19. Criminal Law § 447 (NCI4th)— first-degree murder— resentencing—reference to victim—not grossly improper**

A prosecutor's closing argument in a resentencing for first-degree murder was not grossly improper where the prosecutor argued that only one side of the story had been told because the victim had not testified and that the jurors should consider what the victim would have said if he had been able to testify.

**Am Jur 2d, Trial §§ 280 et seq.**

**20. Evidence and Witnesses § 15 (NCI4th)— first-degree murder—resentencing hearing—federal statutes—judicial notice**

The trial court properly took notice of and instructed upon federal law in a resentencing hearing for first-degree murder

where the only aggravating circumstance submitted was pecuniary gain, the district attorney asked the court during trial to take judicial notice of two United States Code provisions dealing with servicemen's group life insurance and a death gratuity payment, and the court instructed the jury that the provisions of the United States Code are to be accepted as true by the jury. Although defendant contended that the court should have instructed the jury in accordance with N.C.G.S. § 8C-1, Rule 201(g) that it could, but was not required to, accept as conclusive any fact judicially noticed, the United States Code Sections are not adjudicative facts and the trial court properly took notice of and instructed upon federal law.

**Am Jur 2d, Evidence §§ 116 et seq.**

21. **Criminal Law § 1322 (NCI4th)— first-degree murder—resentencing—instructions on parole eligibility not given—no error**

The trial court did not err in a resentencing hearing for first-degree murder by not instructing the jury concerning parole eligibility where defendant argued that the instruction should have been given because of the reference to parole in questions directed to character witnesses. Neither the State nor defendant at any time argued parole eligibility as a consideration in the capital sentencing determination, it has been held consistently that the possibility of parole is not a relevant issue during jury selection, closing argument, or jury deliberation in a capital sentencing proceeding, and the instruction desired by defendant would have brought greater attention to the parole issue. The recent United States Supreme Court decision in *Simmons v. South Carolina*, — U.S. —, is not controlling because this defendant, if given a life sentence, would eventually have been eligible for parole under North Carolina law.

**Am Jur 2d, Trial §§ 100, 890.**

22. **Criminal Law § 1341 (NCI4th)— first-degree murder—resentencing—aggravating factor—pecuniary gain—evidence sufficient**

The trial court did not err at a resentencing for first-degree murder by submitting the aggravating circumstance of pecuniary gain where, taken in the light most favorable to the State, the evi-

dence was sufficient to show that defendant knew of the insurance covering the victim's life. N.C.G.S. § 15A-2000(e)(6).

**Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 888 et seq.**

23. **Criminal Law § 1341 (NCI4th)— first-degree murder— resentencing—pecuniary gain—instruction**

The trial court did not commit plain error in a first-degree murder resentencing hearing in its instruction on the aggravating circumstance of pecuniary gain where the instruction given is in accordance with the Pattern Jury Instruction except for the sentence "the defendant expected to share in the life insurance proceeds on the life of the victim." The judge added clarity to the pattern instruction by emphasizing motivation for the murder when he charged the jury that "This aggravating circumstance examines the motive of the defendant rather than his acts." The instruction, taken as a whole, does not suggest that the jury could find the aggravating circumstance merely based on an expectation of receiving money. The wording of the issues and recommendation form further supports the conclusion that the trial court did not commit plain error in its instruction.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 888 et seq.**

24. **Criminal Law § 1363 (NCI4th)— first-degree murder— resentencing—mitigating circumstances—apprehension of another felon—insufficient evidence**

The trial court did not err in a resentencing hearing for first-degree murder by refusing to submit the mitigating circumstance that defendant aided in the apprehension of another capital felon, even though the case had been remanded for failure to submit this circumstance, because the State introduced less testimony and defendant decided not to include additional evidence that might have required submission of this circumstance. There was insufficient evidence to support a reasonable finding by the jury that defendant aided in Bonnie Sue Clark's apprehension. N.C.G.S. § 2000(f)(8).

**Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 888 et seq.**

**25. Criminal Law §§ 1357, 1360 (NCI4th)— first-degree murder—resentencing—mental or emotional disturbance—impaired capacity—instructions**

The trial court did not commit plain error during a resentencing hearing for first-degree murder in its instructions on the mitigating circumstances of impaired capacity and mental or emotional disturbance where defendant contended that the trial judge should have included in its instruction a defense psychiatrist's testimony regarding defendant's psychological makeup, conjoined with the needs of the coconspirator and that of their relationship. North Carolina law does not require a judge to recapitulate the evidence presented at trial; it is for the jury to consider the evidence it has heard during the sentencing proceeding. N.C.G.S. § 15A-1232.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 888 et seq.**

**26. Criminal Law § 1323 (NCI4th)— first-degree murder—resentencing—weighing aggravating and mitigating circumstances—instructions**

The trial court did not commit error when resentencing defendant for a first-degree murder in its instructions concerning the jury's duty to weigh the aggravating and mitigating factors. The charge did not improperly emphasize the pecuniary gain aggravating circumstance.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 888 et seq.**

**27. Criminal Law § 1348 (NCI4th)— first-degree murder—resentencing—sympathy instruction refused—no error**

The trial court did not err when resentencing defendant for first-degree murder by refusing to instruct the jury on sympathy.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 888 et seq.**

**28. Jury § 141 (NCI4th)— first-degree murder—resentencing—jury selection—questions concerning parole—not allowed**

The trial court did not err when resentencing defendant for first-degree murder by refusing to permit defendant to inquire of prospective jurors whether they possessed any misconceptions

STATE v. BACON

[337 N.C. 66 (1994)]

concerning the parole eligibility of persons convicted of first-degree murder.

**Am Jur 2d, Jury § 197.**

**29. Criminal Law § 455 (NCI4th)— first-degree murder—resentencing—prosecutor's closing argument—deterrence**

The trial court did not err in a resentencing hearing for a first-degree murder by allowing the prosecutor to make a specific deterrence argument.

**Am Jur 2d, Trial § 229.**

**Propriety, under Federal Constitution, of evidence or argument concerning deterrent effect of death penalty. 78 ALR Fed. 553.**

**30. Jury § 226 (NCI4th)— first-degree murder—resentencing—jury selection—rehabilitation not allowed**

The trial court did not err during a resentencing hearing for a first-degree murder by not allowing defense counsel to rehabilitate prospective jurors during the death qualification process.

**Am Jur 2d, Jury §§ 289, 290.**

**31. Jury § 262 (NCI4th)— first-degree murder—resentencing—jurors with reservations about death penalty—State's use of peremptory challenges**

The trial court did not err in a resentencing hearing for first-degree murder by allowing the State to peremptorily challenge jurors who were not subject to a challenge for cause but who expressed reservations about the imposition of capital punishment.

**Am Jur 2d, Jury §§ 289, 290.**

**32. Jury § 243 (NCI4th)— first-degree murder—jury selection—peremptory challenge of prospective juror—preservation issue**

The trial court did not err in a first-degree murder prosecution by sustaining the peremptory challenge of a prospective juror.

**Am Jur 2d, Jury §§ 233 et seq.**

**33. Criminal Law § 477 (NCI4th)— first-degree murder— resentencing—jury selection—entering jury room**

There was no prejudicial error in a resentencing hearing for a first-degree murder where a prospective juror was allowed to enter the jury room at a time when it could still have been occupied by other prospective jurors.

**Am Jur 2d, Trial §§ 1612-1614.**

**34. Jury § 183 (NCI4th)— first-degree murder—jury selection—challenge of prospective juror for cause—preservation issue**

The trial court did not err in a first-degree murder prosecution by sustaining the challenge of a prospective juror for cause.

**Am Jur 2d, Jury §§ 213 et seq.**

**35. Evidence and Witnesses § 729 (NCI4th)— first-degree murder—insurance paper listing beneficiary—admission not prejudicial**

There was no prejudicial error in a first-degree murder prosecution in the admission of testimony that an "insurance paper" was found among the victim's wife's effects after the murder listing her as the beneficiary.

**Am Jur 2d, Appeal and Error §§ 797-801, 803.**

**36. Criminal Law § 1323 (NCI4th)— first-degree murder—resentencing—nonstatutory mitigating circumstance—mitigating value**

There was no prejudicial error in a resentencing hearing for a first-degree murder where the court instructed the jury that it must find a nonstatutory mitigating circumstance to have mitigating value before finding the existence of that circumstance.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 888 et seq.**

**37. Criminal Law § 1341 (NCI4th)— first-degree murder—resentencing—aggravating factors—pecuniary gain**

The trial court did not err in a resentencing for first-degree murder by submitting pecuniary gain as an aggravating circumstance.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 888 et seq.**

**38. Constitutional Law § 365 (NCI4th)— death penalty—constitutional**

Imposing the death penalty upon a first-degree murder defendant was not unconstitutional.

**Am Jur 2d, Criminal Law § 628.**

**Supreme Court's views on constitutionality of death penalty and procedures under which it is imposed or carried out. 90 L. Ed. 2d 1001.**

**39. Jury § 183 (NCI4th)— first-degree murder—jury selection—challenge of prospective juror for cause—preservation issue**

The trial court did not err in a first-degree murder prosecution by sustaining the challenge of a prospective juror for cause.

**Am Jur 2d, Jury §§ 213 et seq.**

**40. Evidence and Witnesses § 1411 (NCI4th)— first-degree murder—resentencing—testimony from first trial—unavailability of witnesses—sufficiency of evidence**

The trial court did not err by permitting the State to offer into evidence at defendant's resentencing for first-degree murder the testimony of two witnesses from the first trial. Under *State v. Grier*, 314 N.C. 59, all that is required is a good faith effort to locate the witness, and the State provided ample evidence of its unsuccessful efforts to find the two witnesses.

**Am Jur 2d, Evidence §§ 914 et seq.**

**Sufficiency of efforts to procure missing witness' attendance to justify admission of his former testimony—state cases. 3 ALR4th 87.**

**41. Criminal Law § 1373 (NCI4th)— first-degree murder—resentencing—one aggravating factor—pecuniary gain—death penalty not disproportionate**

A death sentence was not disproportionate where there was one aggravating circumstance, pecuniary gain, the evidence supported the finding of that circumstance, nothing in the record suggests that the jury sentenced defendant to death under the influence of passion, prejudice, or any other arbitrary factor, and the imposition of the death sentence is not disproportionate to other similar cases. Although defendant contends that the re-

ported decisions involving only the "pecuniary gain" aggravating circumstance indicate that the death sentence is disproportionate, the single aggravating circumstance may outweigh a number of mitigating circumstances and may be sufficient to support a death sentence; death sentences have been affirmed based on four of the eleven aggravating circumstances when only one aggravating circumstance was submitted to and found by the jury. Furthermore, although defendant contends that the same essential facts resulted in a sentence of life imprisonment for the victim's wife, defendant's co-conspirator, there were facts which manifestly distinguish the conduct of the co-participants and justify the disparate sentences. It cannot be said that the death sentence in this case was excessive or disproportionate, considering both the crime and the defendant.

**Am Jur 2d, Criminal Law § 628.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

**42. Criminal Law § 1372 (NCI4th)— first-degree murder—sentencing—proportionality review—pool of cases**

The composition of the "proportionality pool" used in reviewing death sentences reflects post-conviction relief. A post-conviction proceeding which holds that the State may not prosecute the defendant for first-degree murder or results in a retrial at which the defendant is found guilty of a lesser included offense results in the removal of that case from the "pool"; when a post-conviction proceeding results in a new capital trial or sentencing proceeding, which in turn results in a life sentence for a death-eligible defendant, the case is treated as a life case; the case of a defendant sentenced to life imprisonment at a resentencing proceeding ordered in a post-conviction proceeding is similarly treated; and, finally, the case of a defendant who is either convicted of first-degree murder and sentenced to death at a new trial or sentenced to death in a resentencing, which is subsequently affirmed by the N.C. Supreme Court, is treated as a death affirmed case.

**Am Jur 2d, Criminal Law § 628.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

**STATE v. BACON**

[337 N.C. 66 (1994)]

Justice PARKER did not participate in the consideration or decision of this case.

Justice MEYER concurring in the result.

Chief Justice EXUM dissenting.

Justice FRYE joins in this dissenting opinion.

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Fullwood, J., at the 4 February 1991 Criminal Session of Superior Court, Onslow County. Heard in the Supreme Court 8 September 1992; opinion filed 30 June 1993, withdrawn 17 August 1993 for reconsideration of proportionality review issue.

*Michael F. Easley, Attorney General, by David Roy Blackwell, Special Deputy Attorney General, for the State.*

*Sam J. Ervin, IV, for defendant-appellant.*

WHICHARD, Justice.

Defendant was convicted of common law conspiracy to commit murder and first-degree murder at the 18 May 1987 Criminal Session of Superior Court, Onslow County. Following a capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended that defendant be sentenced to death. The trial court sentenced accordingly, and further, imposed a sentence of three years for the conspiracy. Defendant appealed to this Court.

On defendant's direct appeal, this Court concluded that as to the guilt phase defendant received a fair trial free of prejudicial error; however, as to the sentencing proceeding, the trial court's failure to submit a statutory mitigating circumstance constituted prejudicial error. The Court thus remanded for a new capital sentencing proceeding. *State v. Bacon*, 326 N.C. 404, 390 S.E.2d 327 (1990) (hereinafter *Bacon I*).

Following the new sentencing proceeding, the jury again recommended that defendant be sentenced to death, and the trial court sentenced accordingly. For the reasons discussed herein, we conclude that defendant received a fair sentencing proceeding, free of prejudicial error, and that the sentence of death is not disproportionate.

STATE v. BACON

[337 N.C. 66 (1994)]

Except where necessary to develop and determine the issues aris-
ing from defendant's resentencing, we will not repeat the evidence
supporting defendant's convictions, as that evidence is adequately
summarized in *Bacon I*.[1]

Defendant presented further testimony at the resentencing pro-
ceeding from numerous friends and family members that he was an
affable, pleasant person; a good student who never gave any trouble;
giving and a leader; always there to help; not one to hurt anybody;
popular in school and involved in sports-related activities; a clean-cut
kid and a fine young man; a very trustworthy young man who had the
ability to excel in anything that he wanted to start as far as life at
school or business; and an upright citizen with unquestionable
character.

Dr. Billy Royal, a psychiatrist, described defendant as "pleasant,"
of "average intelligence," and relatively unemotional, with "a very lim-
ited view of himself and not a very good self image in terms of being
very successful in life." Dr. Royal opined that the murder resulted
from the meshing of the psychological needs of defendant and co-
conspirator Bonnie Sue Clark. Defendant "had a history . . . of becom-
ing involved [with] people that were in need of assistance" and tried
"to help rescue Ms. Clark from her reported abuse by her husband." It
was the racial slurs, however, directed at defendant by Sergeant Clark
in the car that "resulted in his [losing] control." The murder was thus
an "impulsive act," and even though defendant stabbed Sergeant
Clark some sixteen times, defendant was "a very angry frustrated per-
son at the time." Dr. Royal concluded that defendant's capacity "to
appreciate the criminality of his conduct or to conform his conduct to
the requirements of the law" at the time of the killing was impaired
and the murder was committed while defendant was "under the influ-
ence of [a] mental or emotional disturbance."

The jury found the one aggravating circumstance submitted—
that the murder was committed for pecuniary gain. It found nine mit-
igating circumstances—that defendant had no significant history of
prior criminal activity; acted under the domination of another person;
had no history of violent behavior; had character, habits, mentality,
propensities and activities indicating that he was unlikely to com-

1. The testimony of several witnesses for the State and defendant was presented
through a reading of their testimony at defendant's first trial. The testimony of thirteen
witnesses for defendant was presented through what amounted to a video-taped depo-
sition. Dr. Royal presented live testimony.

**STATE v. BACON**

[337 N.C. 66 (1994)]

mit another violent crime; had committed the murder as the result of circumstances unlikely to recur; had established that his co-defendant, Bonnie Sue Clark, had received a life sentence; had shown remorse since his arrest; and had a family who loved him, continued to visit him while he has been incarcerated, and would continue to do so if he were sentenced to life in prison. It refused to find that the murder was committed while defendant was under the influence of a mental or emotional disturbance; that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired; that his age had mitigating value; that he admitted his involvement at an early stage in the proceedings and/or cooperated with law enforcement officers; that he was gainfully employed and worked regularly at the time of the crime; that he was known as a kind, friendly, and compassionate person who developed strong attachments and friends in the community in which he grew up; that his educational background, homelife, and sobriety had mitigating value; that he was known as a good student, a leader and organizer of recreational activities, and had graduated from high school; that his friends and family could not believe it when they heard he had been involved in a first-degree murder; that they felt that life imprisonment was the appropriate punishment; and that there were other circumstances deemed to have mitigating value.

Upon finding that the mitigating circumstances were insufficient to outweigh the aggravating circumstance, and that the aggravating circumstance was sufficiently substantial to call for the death penalty, the jury recommended a sentence of death.

SENTENCING ISSUES

[1] Defendant first contends that the trial court improperly required Dr. Billy Royal, a psychiatrist employed to assist in the preparation and presentation of defendant's defense, to compile a written report of his evaluation and submit it to the district attorney. Defendant contends that the trial court's action violated his right to be free from compulsory self-incrimination guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 19 and 23 of the North Carolina Constitution.

Defendant concedes that there is no evidence in the record that the district attorney made explicit use of any report compiled by Dr. Royal during the prosecution's cross-examination of him. Defendant further concedes that preparation of a report was not forced upon defendant and that his counsel voluntarily turned over the report. In

discussing the issue of the report at the pretrial hearing, defense counsel stated:

> We won't determine until we have the examination done whether we'll use that testimony. At the point in which we'll decide to use the testimony, we'll ask our expert to prepare a report[,] then we'll furnish it to the District Attorney. We don't want to be in a position of having him examined and not consider that as favorable evidence.

Judge George M. Fountain, who presided over the pretrial hearing on defendant's request for funds to employ the expert, responded: "If you're not going to use it—you don't need a report if you're not going to use it." Counsel replied: "To the extent, Your Honor, we intend to use evidence and the report, at that point we would make a decision to use the evidence and then we would have a report made[;] we would certainly furnish that to [the district attorney]." The trial court then entered a written order finding "that the State [is] entitled to a copy of the results of any mental examination of the defendant if the defendant intends to call the psychiatrist or psychologist as a witness in this case." The record reflects that on the first day of the evidentiary portion of the resentencing proceeding, defendant's counsel submitted the report to the prosecution upon determination that they were going to use Dr. Royal as a witness.

Judge Fountain noted at the pretrial hearing that prior to the original trial, the defense filed a motion for discovery of reports of examinations and tests under N.C.G.S. § 15A-903(e) (1988), with a continuing obligation upon the State to respond. Therefore, because the court had previously granted relief sought by defendant under N.C.G.S. § 15A-903(e),

> the court must, upon motion of the State, order the defendant to permit the State to inspect and copy or photograph results or reports of physical or mental examinations . . . within the possession and control of the defendant which the defendant intends to introduce in evidence at the trial or which were prepared by a witness whom the defendant intends to call at the trial, when the results or reports relate to his testimony.

N.C.G.S. § 15A-905(b) (1988).

Here, the trial court's order provided no more than the reciprocal discovery requirements under N.C.G.S. § 15A-905(b). The trial court merely addressed the district attorney's concern that the expert

**STATE v. BACON**

[337 N.C. 66 (1994)]

would examine the defendant and never prepare a written report, thus hindering the State's ability to cross-examine the expert. By stating in its order that defense counsel must prepare a report if the expert's examination was to be used at trial, the trial court was ensuring fairness to both sides in the preparation of their case. This assignment of error is overruled.

[2] Defendant next alleges that the trial court committed prejudicial error by conducting proceedings out of defendant's presence, in violation of Article I, Section 23 of the North Carolina Constitution as well as the Sixth and Fourteenth Amendments to the United States Constitution. We disagree.

Defense counsel filed a pre-trial motion for complete recordation of all proceedings. They amended the motion so as to assume the burden of telling the court when they wanted particular conferences or communications recorded. In speaking to the motion for recordation, they said: "I think you can maybe put the burden on us to do that and we will remember to ask the court to reconsider that motion each time we believe it's necessary." Subsequently, the trial court held that:

> The Court grants the motion with the modification indicated by counsel for the defendant[,] that modification being that the defendant will bring it to the Court's attention at such time as the defendant desires that bench conferences or any discussions in chambers should be recorded.

In *State v. Buchanan*, 330 N.C. 202, 208-24, 410 S.E.2d 832, 835-45 (1991), this Court addressed the issue of a criminal defendant's right to personal presence as guaranteed by both the United States Constitution and the North Carolina Constitution. It noted that Article I, Section 23 of the North Carolina Constitution extends further than federal Fifth and Fourteenth Amendment protections. *Id.* at 217-18, 410 S.E.2d at 841. After a thorough review of both federal and North Carolina case law, it concluded that even unrecorded bench conferences with counsel for both parties, conducted with the defendant in the courtroom, do not violate the defendant's right to be present unless the conference implicates the defendant's confrontation rights or is such that the defendant's presence would have a reasonably substantial relation to his opportunity to defend. *Id.* at 223-24, 410 S.E.2d at 844-45. Defendant bears the burden of demonstrating the usefulness of his presence. *Id.*

The record indicates that the trial court conducted numerous bench conferences with counsel in which defendant did not partici-

pate. However, nothing in the record indicates that defendant was not present in the courtroom during these discussions. The trial court received no evidence during any of these bench conferences, and most of the discussions concerned mechanical aspects of the proceedings, including lunch breaks, presentation of proposed instructions by the trial court to counsel for their comments, and argument of technical motions or objections out of the jury's hearing. Defendant was represented by counsel during each of these conferences. Defendant could observe the context of each conference and inquire of his counsel at any time concerning the substance of the conferences. Nothing in the record demonstrates how defendant's presence would have served any useful purpose, nor does defendant demonstrate how the conferences impinged upon his opportunity to defend. We conclude that defendant has failed to demonstrate any violation of his constitutional protections. *See Buchanan*, 330 N.C. at 224, 410 S.E.2d at 845.

[3] Defendant also contends that the trial court erred in ordering the bailiff to engage in unrecorded communications with prospective jurors and the trial jury. For example, the trial court instructed the bailiff to "have the jurors fill out the [jury voir dire] questionnaires and then duplicate them." Also, the trial court instructed the bailiff to "put the jurors in the jury room on break" and to "have them to return back to the jury room" at some specified time. The actions of the clerk that defendant contends were error involved the clerk's administrative duties of calling the jury roll and explaining to the jurors what time they needed to arrive at court.

We conclude that these challenged communications were of an administrative nature and did not relate to the consideration of defendant's guilt or innocence. The subject matter in no way implicated defendant's confrontation rights, nor would defendant's presence have had a reasonably substantial relation to his opportunity to defend. Defendant has failed to demonstrate how his presence would have been useful to his defense in these instances, and we thus conclude that no constitutional violation has occurred. *See id.* at 223-24, 410 S.E.2d at 844-45.

[4] Finally, under this assignment of error, defendant contends that the trial court erred by engaging in an unrecorded communication with a prospective juror. The communication occurred after the court asked the prospective juror a series of questions as to her fitness to serve due to her employment situation. The potential juror asked the

court if she could approach the bench and speak to the court quietly. Defendant's counsel responded, "We do not object." After the communication at the bench, the court asked the prospective juror more questions in open court and ultimately excused her. At the end of the day, the court made a record of the communication, stating:

> Let me—I need to state for the record that the juror . . . who was impaneled Number 2 who approached the bench and asked to have her service deferred and counsel consented to have—counsel for the defendant consented to have her to come up to the bench; that she didn't say anything to the Court at that time except repeat what she said in open court. I need to have the record to reflect that.

The record indicates not only that the trial court reconstructed the substance of the bench conference with the prospective juror, but also that defense counsel consented to the bench conference and did not object to the court's decision to excuse the juror. With defendant present, defense counsel consented to this juror being deferred; therefore, we conclude that no prejudicial error has been shown. *See State v. Ali*, 329 N.C. 394, 404-06, 407 S.E.2d 183, 190 (1991).

**[5]** Defendant next contends that the trial court improperly permitted the district attorney to cross-examine defendant's expert psychiatrist as to whether defendant was dangerous. He contends that this alleged error violated the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 19 and 27 of the North Carolina Constitution. He argues that dangerousness is not a statutory aggravating circumstance listed in N.C.G.S. § 15A-2000(e) and that it therefore cannot be admitted into evidence unless it is used to rebut a mitigating circumstance. Defendant contends that the trial court did not submit any nonstatutory mitigating circumstance that the evidence of dangerousness could rebut or weaken. He argues that the State cannot introduce evidence of dangerousness to rebut a statutory mitigating circumstance. Further, he submits that the trial court's allowance of the testimony contributed to the jury's refusal to find the two statutory mitigating circumstances that "[t]he capital felony was committed while the defendant was under the influence of mental or emotional disturbance," N.C.G.S. § 15A-2000(f)(2) (1988), and that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired." N.C.G.S. § 15A-2000(f)(6) (1988).

Dr. Billy W. Royal testified as an expert in forensic psychiatry. During direct examination, Dr. Royal testified that he evaluated

defendant at the behest of defense counsel. In response to defense counsel's questioning, Dr. Royal gave his opinion that on 1 February 1987, defendant suffered from an impaired capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law and that defendant stabbed the victim while under the influence of a mental or emotional disturbance. During cross-examination by the district attorney, Dr. Royal acknowledged that, at the time defendant killed Sergeant Clark, defendant knew he was stabbing Clark and knew that such conduct was wrong. Dr. Royal noted that the killing constituted an impulsive act on defendant's part, which he would have committed even in the view of a uniformed police officer. Dr. Royal stated that he considered defendant dangerous.

At the beginning of his sentencing evidence, defendant introduced videotaped depositions by his friends from Ayer, Massachusetts, where he had lived before moving to North Carolina. The taped depositions depicted defendant as someone who would not kill another human being. All the witnesses described defendant as a well-mannered, even-tempered person. The witnesses also stated that this crime was totally out of character for defendant. Subsequently, defendant requested, and the trial court submitted, a nonstatutory mitigator that the character, habits, mentality, propensities, and activities of the defendant indicate that he is unlikely to commit another violent crime.

North Carolina Rules of Evidence permit broad cross-examination of expert witnesses. N.C.G.S. § 8C-1, Rule 611(b) (1992). The State is permitted to question an expert to obtain further details with regard to his testimony on direct examination, to impeach the witness or attack his credibility, or to elicit new and different evidence relevant to the case as a whole. " 'The largest possible scope should be given,' and 'almost any question' may be put 'to test the value of his testimony.' " 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 42 (3d ed. 1988) (footnotes omitted) (citations omitted). The district attorney's cross-examination of Dr. Royal was proper rebuttal on the two mitigating circumstances enumerated in N.C.G.S. § 15A-2000(f)(2) and (f)(6). The jury's responsibility is to find any mitigating circumstance supported by the evidence and then to determine how much weight to give to the mitigating circumstance. *State v. Fullwood*, 323 N.C. 371, 396, 373 S.E.2d 518, 533 (1988), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 602 (1990), *on remand*, 329 N.C. 233, 404 S.E.2d 842 (1991); *State v. Kirkley*, 308

N.C. 196, 220, 302 S.E.2d 144, 158 (1983), *overruled on other grounds by State v. Shank*, 322 N.C. 243, 251, 367 S.E.2d 639, 644 (1988).

Additionally, the district attorney's cross-examination of Dr. Royal, including the elicited response relating to defendant's dangerousness, plainly rebuts the evidence in support of defendant's non-statutory mitigator concerning the likelihood that he would not commit another violent crime. This assignment of error is overruled.

[6] Defendant next argues that the trial court violated his due process rights by allowing the district attorney to cross-examine Dr. Royal concerning the compensation that Royal would receive from his participation in the case. He asserts that this error was compounded when the trial court permitted the district attorney to argue during his closing argument that the jury should view the expert's testimony with caution because of this financial arrangement. Moreover, defendant contends that the interested-witness instruction given by the court during jury instruction was prejudicial and unconstitutionally influenced the jury's decision not to find two statutory mitigating circumstances, specifically, that "[t]he capital felony was committed while the defendant was under the influence of mental or emotional disturbance," N.C.G.S. § 15A-2000(f)(2), and that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired," N.C.G.S. § 15A-2000(f)(6). Defendant asserts that the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 19 and 27 of the North Carolina Constitution were violated by this interested-witness instruction.

During cross-examination by the district attorney, Dr. Royal admitted that during the past ten years in his forensic work, he had testified exclusively for the defense and that in ninety percent of his cases, he had diagnosed the defendant as having psychological problems. The State asked Dr. Royal his method of being paid, and the psychiatrist disclosed that he billed his services at a rate of $120.00 an hour, with the trial court determining the actual amount paid to him. The court then sustained an objection by defense counsel to the question, "Of course, you recognize, Dr. Royal, that if you don't have a reputation of finding something psychiatrically wrong with people, that criminal defense lawyers will not employ you to examine their clients, isn't that correct, sir?"

During his final argument, the prosecutor used Dr. Royal's testimony regarding his "financial interest" in the case to impeach his

credibility. Because defense counsel did not object during the closing argument, the standard on review is gross impropriety which would require the trial court to intervene *ex mero motu*. *State v. Johnson*, 298 N.C. 355, 368-69, 259 S.E.2d 752, 761 (1979). After reviewing the record, we conclude that this standard has not been met. "[C]ounsel is allowed wide latitude in the argument to the jury." *Id.* at 368, 259 S.E.2d at 761. Under the evidence, counsel's remarks fall within the boundaries set by this Court. The district attorney properly cross-examined Dr. Royal concerning his forensic practice, his possible bias, and his status as a paid witness. In addition, the prosecutor properly argued to the jury the importance of that testimony from the State's perspective. Nothing in the prosecutor's argument unduly prejudiced defendant or dwelt upon material not in the record.

[7] Defendant also argues that the trial court erred in instructing the jurors that "[y]ou may find that a witness is interested in the outcome of this trial" and that "[i]n deciding whether or not to believe such a witness, you may take the interest of the witness into account." Defendant asserts that this instruction unconstitutionally influenced the jury's decision not to find the (f)(2) and (f)(6) statutory mitigating circumstances. Because the record contains no objection to the trial court's giving of this instruction, we review the challenged instruction only for plain error. *See State v. Collins*, 334 N.C. 54, 61-62, 431 S.E.2d 188, 193 (1993).

We conclude that the giving of the interested-witness instruction, if error, did not constitute plain error so fundamental that justice cannot have been done, and that there were other reasons for the jury to decline to find the two statutory mitigating circumstances noted by defendant. Included among these reasons, the State showed through the cross-examination of Dr. Royal that he lacked a board certification as a forensic psychiatrist, which could have caused the jury to question his credibility. Equally important, there was a lapse of three years between when defendant killed the victim and when Dr. Royal examined him. The jury could likewise conclude that this was too long a period of time for an accurate assessment of defendant's mental condition at the time of the killing.

[8] Defendant next contends he did not receive effective assistance of counsel during the resentencing proceeding. To prevail, defendant must meet the test set out in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, *reh'g denied*, 467 U.S. 1267, 82 L. Ed. 2d 864 (1984),

which we expressly adopted in *State v. Braswell*, 312 N.C. 553, 324 S.E.2d 241 (1985):

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, *a trial whose result is reliable.*

*Braswell*, 312 N.C. at 562, 324 S.E.2d at 248 (quoting *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693). The standard to be met under the state Constitution is identical to that under the federal Constitution. *State v. Thomas*, 329 N.C. 423, 439, 407 S.E.2d 141, 151 (1991).

Defendant first argues that defense counsel presented videotaped depositions from defendant's former friends and neighbors that contained explicit or implicit references to his possible parole. In the testimony in question, defense counsel inquired of the witnesses concerning their willingness to welcome defendant into their home or community if, following conviction, defendant served a number of years in prison and then was released and paroled. All of the witnesses indicated they would welcome defendant into their community or home.

We conclude that the thrust of the question posed to these witnesses dwelt upon defendant's purported good character and how out of character the killing was. The references to parole all occurred in the context of defendant's former friends and their unchanged favorable view of him following his conviction. We do not believe defense counsel acted unreasonably in eliciting this favorable testimony.

**[9]** In further support of his argument, defendant points out the trial court's refusal to allow him on voir dire to examine prospective jurors concerning their views on parole. We hold that the trial court did not err in refusing to allow the questioning of prospective jurors concerning their views on parole, as such questioning is irrelevant under the facts of this capital resentencing proceeding. *State v. McNeil*, 324 N.C. 33, 42-44, 375 S.E.2d 909, 915-16 (1989), *sentence vacated on other grounds*, 494 U.S. 1050, 108 L. Ed. 2d 756, *on remand*, 327 N.C. 388, 395 S.E.2d 106 (1990), *cert. denied*, 499 U.S. 942, 113 L. Ed. 2d 459 (1991).

[10] Defendant next contends that his counsel provided ineffective representation by presenting evidence that defendant had received a death sentence in the first sentencing proceeding. During defendant's closing argument, counsel mentioned that defendant comes from a loving family and that during his first sentencing, the courtroom contained several family members, but due to financial considerations and other conflicts revolving around work, the same family members were unable to attend this resentencing. Counsel further argued:

> And [defendant's] mother had to sit here in the courtroom and listen to a judge impose a death penalty on her son. And so I suggest that it shouldn't surprise you that she's not here again.

Defendant contends that this mention of his previous sentence was prejudicial and tainted the jury's decision in this case. He argues that the jury was much more likely to impose a sentence of death knowing that a previous jury had recommended death.

We deem this argument a trial tactic to explain the absence of defendant's mother. *See State v. Richards*, 294 N.C. 474, 500, 242 S.E.2d 844, 860 (1978). In addition, mere knowledge by the jurors of the prior death sentence does not necessarily demonstrate prejudice to the defendant. *See State v. Simpson*, 331 N.C. 267, 271, 415 S.E.2d 351, 353-54 (1992). We conclude that defendant has failed to show that his counsel performed below an objective standard of reasonableness or that actual prejudice resulted.

[11] Defendant next assigns as error that his due process rights were violated when the prosecutor repeatedly emphasized future dangerousness and brutality during his closing argument. Defendant argues that the State was attempting to get around the fact that the aggravating circumstance "especially heinous, atrocious, or cruel," N.C.G.S. § 15A-2000(e)(9), could not be considered because, though submitted during the first trial, the first jury did not find that aggravating circumstance to exist.

During the closing remarks by the district attorney, only one objection was entered that centered around the argument concerning future dangerousness and brutality. The district attorney, apparently alluding to the number of stab wounds, stated: "When you get back there in the jury room—I mean, just moving your hand through the air, ladies and gentlemen, and coming down sixteen times, that takes awhile. How brutal—how, brutal can he be?" Defense counsel objected, and the court overruled his objection.

Defendant also assigns error to portions of the district attorney's jury argument in which he explicitly or implicitly told the jury that defendant remains dangerous. Defendant contends that by arguing the brutal nature of the killing and that defendant is dangerous, the district attorney in effect was arguing an aggravating circumstance not listed in N.C.G.S. § 15A-2000(e).

In arguing to the jury, counsel are given wide latitude and may argue the facts in evidence, all reasonable inferences from those facts, and the relevant law. *State v. Covington*, 290 N.C. 313, 327-28, 226 S.E.2d 629, 640 (1976). The standard of review for this Court, absent objection, is whether the argument is so grossly improper as to require the trial court to intervene *ex mero motu*. *Johnson*, 298 N.C. at 369, 259 S.E.2d at 761.

As to the one objection that was made, we conclude that there was no error in overruling it. The district attorney's argument was based on testimony by the defendant's own witness, Dr. Royal, during cross-examination. The district attorney asked Dr. Royal if it was his opinion that if "a uniformed police officer had been standing there outside there at that car when he was doing the stabbing sixteen times that he would have continued to do it," and Dr. Royal testified "yes." When next asked, "Well, doctor, if somebody would stab a person sixteen times with a uniformed police officer standing there, would you say, sir, that that person is dangerous?" Dr. Royal answered, "I would think so, yes." Based on this testimony, the district attorney merely argued to the jury the evidence presented at the trial.

Further, when reviewing the aggravating and mitigating circumstances for the jury, the district attorney plainly stated that there was only one aggravating circumstance for its consideration—pecuniary gain. N.C.G.S. § 15A-2000(e)(6) (1988). The trial court instructed on, and submitted for the jury's consideration, only the pecuniary gain aggravating circumstance. Neither the district attorney nor the trial court ever mentioned the especially heinous, atrocious, or cruel aggravator. Under these circumstances, we conclude that it was clear to the jury that pecuniary gain constituted the sole aggravating circumstance upon which it could return a sentence of death and that defendant suffered no undue prejudice by the prosecutor's mention of brutality or future dangerousness. *See State v. Brown*, 320 N.C. 179, 198-99, 358 S.E.2d 1, 15, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987).

**[12]** Defendant also assigns error to what he contends were various misstatements of law and fact by the district attorney during closing arguments. Defendant argues that the district attorney implied that the mere fact that defendant committed a murder justified a death sentence. In support of his position, defendant cites *Woodson v. North Carolina*, 428 U.S. 280, 49 L. Ed. 2d 944 (1976), for the proposition that there can be no mandatory death sentence; the jury must consider all the circumstances of the case and the character of the defendant before deciding on the death penalty. Defendant contends that the jury was not able to follow the law correctly because the district attorney in his argument asked rhetorical questions of the jury, such as, "Can you say he doesn't deserve the same thing that he imposed?" Later in his argument, the district attorney rhetorically asked, "Do you think that he deserves any less for what he did now that he's had a fair trial than the sentence that he imposed and should he get any less than that?" We conclude that this argument was not so grossly improper as to require the trial court to intervene *ex mero motu*.

**[13]** Defendant also argues that the district attorney improperly suggested to the jury that it weigh the aggravating circumstance against the mitigating circumstances one on one and not consider the mitigating circumstances as a group as required by N.C.G.S. § 15A-2000(c). Defendant submits that the district attorney asked rhetorical questions of the jury about each of the mitigating circumstances. For instance, the district attorney stated that

> if you stab somebody sixteen times they're just as dead whether the person that's doing it is eighteen years old or seventy-five years old. . . .

> . . . .

> . . . [T]he fact that he's twenty-seven years old when this crime occurred—I guess he's thirty-one now—that has nothing to do with whether or not he ought to get the death penalty.

We conclude that, taking the argument in context, the district attorney did not argue improperly to the jury why it should not find various mitigating circumstances. His approach was to argue each mitigating circumstance separately. He explained that when viewing the mitigating and aggravating circumstances, it is not a "counting process," and he told the jury to weigh the aggravating circumstance against the mitigating circumstances. Further, the trial court correct-

ly charged the jury regarding the weighing process it was required to undertake when considering the aggravating circumstance and the mitigating circumstances.

**[14]** Defendant further contends that the district attorney improperly argued to the jury how it should view the mitigating circumstance that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired." N.C.G.S. § 15A-2000(f)(6). The district attorney argued to the jury that it should not find this mitigating circumstance because defendant's own witness, Dr. Royal, testified that defendant knew what he was doing when he committed the murder. After careful review, we conclude that the argument went to the weight to be given this mitigating circumstance. It is for the jury to decide how much weight to give to each mitigating circumstance, and the district attorney may argue the evidence the jury should consider when determining whether to find a certain mitigating circumstance. *See State v. Laws*, 325 N.C. 81, 119, 381 S.E.2d 609, 632 (1989), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *on remand*, 328 N.C. 550, 402 S.E.2d 573, *cert. denied*, —— U.S. ——, 116 L. Ed. 2d 174, *reh'g denied*, —— U.S. ——, 116 L. Ed. 2d 648 (1991).

**[15]** In addition, defendant argues that the district attorney misstated the testimony of Dr. Royal concerning the percentage of his clients that he determines have psychiatric problems. A review of the record shows that Dr. Royal testified that in his forensic work, ninety percent of the patients he examines have psychiatric problems. The district attorney, in his argument to the jury, stated that "Dr. Royal finds 90 percent of the people he examines [have] some kind of a psychiatric problem." We conclude that this misstatement of fact, if it can indeed be considered a misstatement, was harmless in light of the trial court's instruction to the jury that what counsel said was not evidence.

**[16]** Defendant further submits that the district attorney spoke of facts not in evidence when he stated that many of the organizations Dr. Royal belonged to are ones that require only a membership fee. After Dr. Royal admitted on cross-examination that he failed the examination for board certification as a forensic psychiatrist, defendant introduced testimony to show the various professional organizations of which Dr. Royal was a member.

As this Court held in *Brown*, 320 N.C. at 204-05, 358 S.E.2d at 18-19, the prosecutor may note the failure to produce evidence. Thus, we

**STATE v. BACON**

[337 N.C. 66 (1994)]

conclude that the district attorney properly drew the jurors' attention to the failure to establish any membership qualifications for these various professional organizations. We find no error in the district attorney's argument.

[17] Defendant further complains of the prosecutor's remark during closing arguments regarding the lack of evidence that defendant had admitted his involvement at an early stage in the proceedings or had cooperated with law enforcement officers. Specifically, the district attorney stated, "You haven't heard any evidence to support that." Defendant argues that he made an inculpatory statement to officers on 2 February 1989. Because no objection to the district attorney's statement was entered on the record, the gross impropriety standard is applied. *Johnson*, 298 N.C. at 369, 259 S.E.2d at 761. After review of the record, we conclude that the argument was not grossly improper, and in any event, the trial court charged the jurors that closing statements do not constitute evidence and that they were required to decide the case only on the evidence.

[18] Defendant next contends that the district attorney improperly argued that the jury should decline to find the no history of violent behavior mitigator because of Dr. Royal's testimony concerning defendant's prior violent incident in Massachusetts. Specifically, the prosecutor argued that the jury should refrain from finding defendant had "no history of violent behavior" by referring to Dr. Royal's testimony "that [defendant] had told him something about some conflict that he'd gotten into with somebody in Massachusetts" in which defendant "got out and slapped the boy." The trial court cautioned the jurors to consider the evidence only for the purpose of explaining or supporting Dr. Royal's opinion. The record contains no objection to this portion of the district attorney's argument. Review of the record discloses that the jury found the mitigating circumstance that defendant did not have a history of violent behavior; thus, we conclude that defendant suffered no prejudice.

[19] The last of the errors alleged to have occurred during the district attorney's closing argument is that the district attorney made improper references to Sergeant Clark. During the district attorney's closing remarks, he told the jurors that because the victim had not testified, they had heard only one side of the story. The district attorney then asked the jurors to consider what the victim would have said if he had been able to testify. We conclude that this argument was not so grossly improper as to warrant the trial court's intervention *ex mero motu*.

**STATE v. BACON**

[337 N.C. 66 (1994)]

This assignment of error is overruled.

**[20]** Defendant next argues that the trial court improperly instructed the jury concerning the effect of the court's decision to take judicial notice of Title 38, Subchapter 3 of the United States Code, which provides servicemen's group life insurance coverage, and 10 U.S.C. § 1475, which provides a death gratuity payment. After reading both provisions to the jury, the trial court instructed the jury that the provisions of the United States Code are to be accepted as true by the jury. Defendant contends that the trial court should have instructed the jury in accordance with N.C.G.S. § 8C-1, Rule 201(g), which requires the trial court in a criminal case to "instruct the jury that it may, but is not required to, accept as conclusive any fact judicially noticed." Defendant contends that the failure to instruct the jury in accordance with Rule 201(g) impaired his chances of persuading the jury not to find the pecuniary gain aggravating circumstance.

During the trial, the district attorney asked the trial court to take judicial notice of two United States Code sections. After the court read these two federal laws to the jury, he instructed the jury that "I have taken judicial notice of certain laws regarding life insurance[] which I have read to you. These matters of which I have taken judicial notice, you will accept as true for the purpose of this trial." The State contends, and we agree, that the United States Code sections are not adjudicative facts. N.C.G.S. § 8-4 specifically provides that "[w]hen any question shall arise as to the law of the United States, . . . the court shall take notice of such law in the same manner as if the question arose under the law of this State." N.C.G.S. § 8-4 (1986). The trial court instructed the jury as to the federal law as it would have any state law and as required by statute. As the commentary to Rule 201 notes, the rule "deals only with judicial notice of 'adjudicative' facts." In the present case, the trial court properly took notice of and instructed upon federal law. This assignment of error is without merit.

**[21]** Defendant next contends that the trial court erred by failing to instruct the jurors concerning parole eligibility. Defendant argues that, because of the reference to parole in questions directed to character witnesses, the trial court should have given the requested instruction. We conclude that the trial court properly declined to so instruct the jurors.

As previously noted, during videotaped testimony defense counsel posed questions to several witnesses regarding whether they

would welcome defendant back into their homes or community if he was later "paroled" or "released." Several character witnesses testified that defendant would be welcomed back into the community if he received a life sentence and was later released. However, neither the State nor defendant at any time argued parole eligibility as a consideration in the capital sentencing determination.

We conclude that these references to parole, in the context of evidence of defendant's good character, did not influence the jury during deliberation as to the appropriate sentence. The lengthy instruction that defendant submits the trial court should have given would have brought greater attention to the parole issue. This Court has consistently held that the possibility of parole is not a relevant issue during jury selection, closing argument, or jury deliberation in a capital sentencing proceeding. *McNeil*, 324 N.C. at 44, 375 S.E.2d at 916; *State v. Robbins*, 319 N.C. 465, 518-19, 356 S.E.2d 279, 310-11, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987); *State v. Jones*, 296 N.C. 495, 502-03, 251 S.E.2d 425, 429 (1979). We are advertent to the recent United States Supreme Court decision in *Simmons v. South Carolina*, —— U.S. ——, 129 L. Ed. 2d 133 (1994), which held it error to refuse to give a proposed instruction that under state law the defendant was ineligible for parole, especially in view of the State's reference in its jury argument to the defendant's future dangerousness. We do not consider that case controlling here because defendant here, if given a life sentence, would eventually have been eligible for parole under North Carolina law. *See* N.C.G.S. § 15A-1371(a1) (1988). We conclude that this assignment of error is without merit.

[22] Defendant next contends that the trial court erred by submitting the pecuniary gain aggravating circumstance set forth in N.C.G.S. § 15A-2000(e)(6). He argues that there was insufficient evidence to show that defendant's motive to kill the victim was to share in the proceeds of the victim's insurance. We reject this contention. Taken in the light most favorable to the State, the evidence is sufficient to show that defendant knew of the insurance covering the victim's life. *See State v. Stanley*, 310 N.C. 332, 339, 312 S.E.2d 393, 397 (1984). At the time of the stabbing, Glennie Clark carried a group insurance policy on his life in the amount of $50,000, with the death benefits payable to the beneficiary, Bonnie Sue Clark. Defendant, in his testimony during the sentencing proceeding of his initial trial, which was read into evidence at resentencing, testified that the insurance "would have been ours," referring to himself and Bonnie Sue Clark. When asked if he believed he would receive some of the insurance

money if Bonnie Sue Clark were to receive it, defendant responded "yes." After the stabbing, an insurance paper with Glennie Clark as the named insured and Bonnie Sue Clark as the beneficiary was found in a room shared by Bonnie Sue Clark and defendant. Defendant testified that prior to the murder, he had to borrow $400.00 to meet his expenses. There was also evidence that defendant told several people he would be receiving a large sum of money soon. Considering the totality of the evidence, there are ample facts to support the conclusion that defendant's motive for the murder was pecuniary gain. We thus conclude that the trial court did not err in submitting pecuniary gain as a possible aggravating circumstance.

[23] Defendant next argues that the trial court improperly instructed the jury on this aggravating circumstance. He submits that the instruction had the effect of permitting the jury to find pecuniary gain even if it determined that defendant did not kill Glennie Clark for the express purpose of obtaining the insurance money. Defendant asserts that the mere expectation of a particular result does not constitute a motive for the act which produces that result.

There was no objection to the instruction. Accordingly, our review is for plain error. *State v. Bronson*, 333 N.C. 67, 78, 423 S.E.2d 772, 778 (1992); *State v. Jeune*, 332 N.C. 424, 436, 420 S.E.2d 406, 413 (1992). "[T]o reach the level of 'plain error' . . ., the error in the trial court's jury instructions must be 'so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached.' " *Collins*, 334 N.C. at 62, 431 S.E.2d at 193 (quoting *State v. Bagley*, 321 N.C. 201, 213, 362 S.E.2d 244, 251 (1987), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988)).

We decline to find plain error on two different grounds. First, the trial court instructed the jury in part as follows:

This aggravating circumstance examines the motive of the defendant rather than his acts.

If you find from the evidence beyond a reasonable doubt that when the defendant killed the victim the defendant expected to share in the life insurance proceeds on the life of the victim, you would find this aggravating circumstance, and would so indicate by having your foreperson to write "yes" in the space after this aggravating circumstance on the Issues and Recommendation Form where you see the place for answer.

Except for the sentence "the defendant expected to share in the life insurance proceeds on the life of the victim," the instruction is in accordance with the North Carolina Pattern Jury Instructions. N.C.P.I.—Crim. 150.10 (1992). The trial court added clarity to the pattern instruction by emphasizing motivation for the murder when it charged the jury: "This aggravating circumstance examines the motive of the defendant rather than his acts." The instruction, taken as a whole, does not suggest to the jury that it could find the aggravating circumstance merely based on an *expectation* of receiving money.

In addition, the wording of the issues and recommendation form further supports our conclusion that the trial court did not commit plain error in its instruction. On the issues and recommendation form, the issue regarding the pecuniary gain factor was stated, "Was this murder committed for pecuniary gain?" The jury indicated on the form that the motivation and purpose of the murder was pecuniary gain; therefore, the jury found that defendant killed Glennie Clark in order to benefit from the insurance proceeds. This assignment of error is overruled.

[24] In his next assignment of error, defendant contends the trial court erred in refusing to submit the statutory mitigating circumstance that he aided in the apprehension of another capital felon. N.C.G.S. § 15A-2000(f)(8). Defendant argues that the record shows that he made statements to law enforcement officers which aided them in the apprehension of Bonnie Sue Clark. In the first sentencing proceeding, the trial court failed to submit this mitigating circumstance, and we remanded for a new sentencing proceeding for this reason. In *Bacon I*, this Court held that any reasonable doubt about the submission of a mitigating circumstance must be resolved in defendant's favor. *Bacon I*, 326 N.C. at 418, 390 S.E.2d at 335-36. We conclude that in the second sentencing, the trial court properly found that no reasonable doubt existed that the aiding in apprehension mitigating circumstance should not be submitted, and thus it did not err in refusing to submit this circumstance.

Much of the evidence presented at defendant's first sentencing proceeding which tended to show that defendant aided investigators in apprehending Clark was not introduced by either the State or defendant in the second sentencing proceeding. There was no evidence presented of statements by Bonnie Sue Clark after she was taken to the hospital. Nor was there evidence of any of defendant's

statements other than his own in-court testimony at the original sentencing proceeding. What the record in the second sentencing proceeding does contain is defendant's testimony during the first sentencing proceeding in which he acknowledged that the insurance money would have been his and Clark's. Also in the record is the State's cross-examination of defendant during the original sentencing proceeding in which he recounted to police officers his conversation with Bonnie Sue Clark about why he did not kill Sergeant Clark on Saturday night. He told her he did not kill Sergeant Clark on Saturday night because there were too many police officers in the area. No evidence before the second jury showed the exact timing of defendant's statements or their relation to the custodial status of Clark. In contrast to the first sentencing proceeding, here the State introduced less testimony, and defendant decided not to include additional evidence that might have required submission of this mitigating circumstance.

We conclude that there was insufficient evidence to support a reasonable finding by the jury that defendant aided in Bonnie Sue Clark's apprehension, and the trial court thus did not err in refusing to submit this mitigating circumstance.

[25] Defendant next contends the trial court erred in its jury instructions on the mental or emotional disturbance mitigating circumstance, N.C.G.S. § 15A-2000(f)(2), and the impaired capacity mitigating circumstance, N.C.G.S. § 15A-2000(f)(6). Defendant, relying on *State v. Johnson*, 298 N.C. 47, 68-70, 257 S.E.2d 597, 613-14 (1979), argues that the trial court must instruct the jury in such a manner as to permit an adequate understanding of the (f)(2) and (f)(6) statutory mitigating circumstances. Thus, defendant asserts that the trial court should have included in its instruction the evidence of the relationship between defendant and Bonnie Sue Clark. In addition, defendant submits that the trial court should have included in its instruction Dr. Royal's testimony regarding defendant's psychological makeup, conjoined with the needs of Bonnie Sue Clark and that of their relationship. Because defendant did not object to this instruction at trial, any defect must rise to the level of plain error for defendant to be entitled to relief.

The trial court charged the jury in accordance with the Pattern Jury Instruction. *See* N.C.P.I.—Crim. 150.10. Our statutory and case law do not require a court to recapitulate the evidence presented at trial. N.C.G.S. § 15A-1232 (1988); *State v. Adcox*, 303 N.C. 133, 140, 277 S.E.2d 398, 402 (1981). It is for the jury to consider the evidence

it has heard during the course of the sentencing proceeding. We conclude that the trial court properly instructed the jury on the impaired capacity and the mental or emotional disturbance circumstances. This assignment of error is without merit.

[26] Defendant next assigns as error the trial court's instruction to the jurors concerning their duty to consider the submitted aggravating circumstance, the mitigating circumstances, and the process of weighing the circumstances in arriving at a sentencing recommendation. He contends that the charge improperly emphasized the pecuniary gain aggravating circumstance. Defendant did not object before or after the instructions, so review is under the plain error standard.

Defendant's arguments were recently addressed and rejected in *State v. Price*, 326 N.C. 56, 88-90, 388 S.E.2d 84, 102, *sentence vacated on other grounds*, 498 U.S. 802, 112 L. Ed. 2d 7 (1990), *on remand*, 331 N.C. 620, 418 S.E.2d 169 (1992), *sentence vacated on other grounds*, —— U.S. ——, 122 L. Ed. 2d 113, *on remand*, 334 N.C. 615, 433 S.E.2d 746 (1993), *sentence vacated on other grounds*, —— U.S. ——, 129 L. Ed. 2d 888 (1994). Because defendant presents no arguments demonstrating that the trial court failed to comply with well-established law, we conclude that this assignment of error is without merit.

[27] By his next assignment, defendant contends the trial court erred in refusing to instruct the jury "that you are entitled to base your verdict upon any sympathy or mercy you may have for the Defendant that arises from the evidence presented in this case." This proposed instruction arises from *California v. Brown*, 479 U.S. 538, 93 L. Ed. 2d 934 (1987), which held that sympathy instructions are not prohibited under the federal Constitution. For the reasons stated in *State v. Hill*, 331 N.C. 387, 420-21, 417 S.E.2d 765, 782-83 (1992), *cert. denied*, —— U.S. ——, 122 L. Ed. 2d 684, *reh'g denied*, —— U.S. ——, 123 L. Ed. 2d 503 (1993), we conclude that the trial court did not err in refusing to give the instruction.

PRESERVATION ISSUES

[28-39] Defendant raises eleven additional issues which he concedes have been decided against him by this Court: (1) the trial court erred in refusing to permit defendant to ask prospective jurors whether they possessed any misconceptions concerning the parole eligibility of persons convicted of first-degree murder; (2) the trial court erred in allowing the prosecutor to make a specific deterrence argument; (3) the trial court erred in refusing to allow defendant's trial counsel

to rehabilitate prospective jurors during the "death qualification" process; (4) the trial court erred in allowing the State to peremptorily challenge jurors who, although not subject to a challenge for cause, expressed reservations about the imposition of capital punishment; (5) the trial court erred in sustaining the State's peremptory challenge of prospective juror Ray Toudle; (6) the trial court erred in allowing prospective juror Connie Williams to enter the jury room at a time when it could still have been occupied by other prospective jurors; (7) the trial court erred in sustaining the State's challenge for cause to prospective juror Betty Fuller; (8) the trial court erred in permitting Ms. Rosser to testify that she found an "insurance paper" among Ms. Clark's effects after the murder, listing Ms. Clark as the primary beneficiary; (9) the trial court erred in instructing the jury that, before it could find the existence of a nonstatutory mitigating circumstance, it must first find that circumstance to have mitigating value; (10) the trial court erred in submitting as an aggravating circumstance that "this murder [was] committed for pecuniary gain"; and (11) the trial court erred in imposing the death penalty upon defendant on the grounds that the trial court's judgment sentencing defendant to death contravened the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 19 and 27 of the North Carolina Constitution.

We have considered defendant's arguments on these issues, and we find no compelling reasons to depart from our prior holdings. These assignments of error are overruled.

[40] One additional issue that defendant does not concede we have previously addressed is that the trial court committed prejudicial error by permitting the State to offer into evidence at defendant's resentencing the testimony of Lieutenant Charles Bilderback and Ms. Rosser from defendant's first trial. Defendant contends that the State did not provide sufficient evidence to show that these two witnesses were unavailable at his second sentencing proceeding. The State contends, and we agree, that the evidence was sufficient. Under *State v. Grier*, 314 N.C. 59, 68, 331 S.E.2d 669, 675-76 (1985), all that is required is a good faith effort to locate the witness, and the State provided ample evidence of its unsuccessful efforts to find the two witnesses. This assignment of error is overruled.

PROPORTIONALITY REVIEW

[41] Having found in *Bacon I* no error in the guilt-innocence phase, and herein no error in the resentencing phase of defendant's capital

trial, we are required by statute to review the record and determine (1) whether the record supports the jury's finding of the aggravating circumstance upon which the sentencing court based its sentence of death; (2) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2) (1988); *Robbins*, 319 N.C. at 526, 356 S.E.2d at 315.[2]

We have held that the record supports the jury's finding of the single aggravating circumstance that the murder was committed for pecuniary gain. N.C.G.S. § 15A-2000(e)(6). We further conclude that nothing in the record suggests that the jury sentenced defendant to death under the influence of passion, prejudice, or any other arbitrary factor. We thus turn to our final statutory duty of proportionality review and "determine whether the death sentence in this case is excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant." *State v. Brown*, 315 N.C. 40, 70, 337 S.E.2d 808, 829 (1985), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986), *overruled on other grounds, State v. Vandiver*, 321 N.C. 570, 354 S.E.2d 373 (1988). The purpose of proportionality review is "to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury," *State v. Holden*, 321 N.C. 125, 164, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988), and to serve as "a check against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137, *reh'g denied*, 448 U.S. 918, 65 L. Ed. 2d 1181 (1980).

In comparing "similar cases" for purposes of proportionality review, we use as a pool for comparison purposes *all cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

---

2. On 22 December 1992, Judge D. B. Herring, Jr., in Superior Court, Durham County, granted defendant Robbins a new sentencing proceeding as a result of ineffective assistance by his trial counsel. We cite *Robbins* only for the manner in which we review the issue of proportionality.

**STATE v. BACON**

[337 N.C. 66 (1994)]

*State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983).[3] The pool "includes only those cases which this Court has found to be free of error in both phases of the trial." *State v. Stokes*, 319 N.C. 1, 19-20, 352 S.E.2d 653, 663 (1987).

In essence, our task on proportionality review is to compare the case at bar with other cases in the pool which are roughly similar with regard to the crime and the defendant, such as, for example, the manner in which the crime was committed and defendant's character, background, and physical and mental condition. If, after making such a comparison, we find that juries have consistently been returning death sentences in the similar cases, then we will have a strong basis for concluding that a death sentence in the case under review is not excessive or disproportionate. On the other hand if we find that juries have consistently been returning life sentences in the similar cases, we will have a strong basis for concluding that a death sentence in the case under review is excessive or disproportionate.

*State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985). This Court, however, does not "attempt to employ mathematical or statistical models . . . ." *Williams*, 308 N.C. at 80, 301 S.E.2d at 355. Nor does this Court "feel bound . . . to give a citation to every case in the pool of 'similar cases' used for comparison." *Id.* at 81, 301 S.E.2d at 356. "In the final analysis . . . , we will rely upon our own case reports in the 'similar cases' forming the pool of cases which we have indicated we use for comparison purposes." *Id.*

In making the comparison, the Court does not simply engage in rebalancing the aggravating and mitigating factors; rather, it is obligated to scour the entire record for all the circumstances of the case sub judice and the manner in which the defendant committed the crime, as well as defendant's character, background, and physical and mental condition.

*State v. McLaughlin*, 323 N.C. 68, 109, 372 S.E.2d 49, 75 (1988), *sentence vacated on other grounds*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990); *see also State v. Roper*, 328 N.C. 337, 371-73, 402 S.E.2d 600,

---

3. The Fourth Circuit Court of Appeals subsequently granted defendant Williams a new sentencing proceeding for retroactive *McKoy* review. *Williams v. Dixon*, 961 F.2d 448 (4th Cir.), *cert. denied*, — U.S. —, 121 L. Ed. 2d 445 (1992). At resentencing, defendant received a sentence of life imprisonment. We cite *Williams* only for the manner in which we review the issue of proportionality.

620-21 (discussing process of proportionality review), *cert. denied*, ——U.S. ——, 116 L. Ed. 2d 232 (1991); *State v. Artis*, 325 N.C. 278, 337-38, 384 S.E.2d 470, 505 (1989) (same), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991).

[42] We take this opportunity to clarify that the composition of the "proportionality pool" reflects post-conviction relief awarded to death-sentenced defendants. A death-sentenced defendant may seek post-conviction review in both state and federal court.[4] There is no difference in principle between an appellate reversal and a post-conviction order granting relief to a convicted first-degree murderer. In both instances, a court of competent jurisdiction has held that the underlying trial or sentencing proceeding was infected with prejudicial error. As we have heretofore stated:

> [P]roportionality review is to be undertaken "only in cases where both phases of the trial of a defendant have been found to be without error. Only then can we have before us the true decision of the jury to which we feel great deference should be accorded." It would be incongruous for us to compare the facts of the present case with those of cases in which prejudicial error has been found.

*Jackson*, 309 N.C. at 45, 305 S.E.2d at 717 (quoting *State v. Goodman*, 298 N.C. 1, 35, 257 S.E.2d 569, 591 (1979)). Any other result would bias the proportionality review process.[5]

---

4. State post-conviction review is initiated when the defendant files a motion for appropriate relief pursuant to N.C.G.S. § 15A-1411. "A motion for appropriate relief, whether made before or after the entry of judgment, is a motion in the original cause and not a new proceeding." N.C.G.S. § 15A-1411(b) (1988). Federal post-conviction review is initiated when the defendant petitions for the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2241 (1992). Although "[t]he writ of habeas corpus is not a proceeding in the original criminal prosecution but an independent civil suit," *Riddle v. Dyche*, 262 U.S. 333, 333-36, 67 L. Ed. 1009, 1011 (1923), federal habeas corpus proceedings provide " 'a bulwark against convictions that violate "fundamental fairness." ' " *Brecht v. Abrahamson*, 507 U.S. ——, ——, 123 L. Ed. 2d 353, 370 (quoting *Engle v. Isaac*, 456 U.S. 107, 126, 71 L. Ed. 2d 783, 799 (1982), *reh'g denied*, —— U.S. —— , 124 L. Ed. 2d 698 (1993)).

5. If this Court, for example, were to remove cases in which convicted first-degree murderers receive relief in subsequent post-conviction proceedings from the pool entirely, the only cases which ever re-entered the pool would be the subset thereof which resulted in new murder convictions (where a new trial had been ordered) or new death sentences (where a new sentencing proceeding only had been ordered). This result would bias the proportionality review process in favor of death sentences.

STATE v. BACON

[337 N.C. 66 (1994)]

Because the "proportionality pool" is limited to cases involving first-degree murder convictions, a post-conviction proceeding which holds that the State may not prosecute the defendant for first-degree murder or results in a retrial at which the defendant is acquitted or found guilty of a lesser included offense results in the removal of that case from the "pool." When a post-conviction proceeding results in a new capital trial or sentencing proceeding, which, in turn, results in a life sentence for a "death-eligible" defendant, the case is treated as a "life" case for purposes of proportionality review. The case of a defendant sentenced to life imprisonment at a resentencing proceeding ordered in a post-conviction proceeding is similarly treated. Finally, the case of a defendant who is either convicted of first-degree murder and sentenced to death at a new trial or sentenced to death in a resentencing proceeding ordered in a post-conviction proceeding, which sentence is subsequently affirmed by this Court, is treated as a "death-affirmed" case.[6]

6. There are certain timing issues that we have resolved following certain basic principles, *viz*, that a conviction and death sentence affirmed on direct appeal is presumed to be without error, and that a post-conviction decision granting relief to a convicted first-degree murderer is not final until the State has exhausted all available appellate remedies. Application of those rules requires, for example, that the decision in *State v. Holden*, 321 N.C. 125, 362 S.E.2d 513 (1987), be considered outside the "proportionality pool" because this Court has not yet affirmed the death sentence which the defendant received at the resentencing proceeding ordered by Judge I. Beverly Lake, Jr., in Superior Court, Duplin County, on 7 December 1990. The decision in *State v. McDowell*, 301 N.C. 279, 271 S.E.2d 206 (1980), *cert. denied*, 450 U.S. 1025, 68 L. Ed. 2d 220, *reh'g denied*, 451 U.S. 1012, 68 L. Ed. 2d 865 (1981), is excluded from the "pool" entirely because the defendant entered a negotiated plea to second-degree murder following the decision in *McDowell v. Dixon*, 858 F.2d 945 (4th Cir. 1988), *cert. denied*, 489 U.S. 1033, 103 L. Ed. 2d 230 (1989). The decision in *State v. Noland*, 312 N.C. 1, 320 S.E.2d 642 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369, *reh'g denied*, 471 U.S. 1050, 85 L. Ed. 2d 342 (1985), is treated as a "death-affirmed" case because the order entered by Judge James B. McMillan on 3 December 1992, in *Noland v. Dixon*, 831 F. Supp. 490 (W.D.N.C. 1993), has not been reviewed on appeal. The decision in *State v. Robbins*, 319 N.C. 465, 356 S.E.2d 279, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987), is currently outside the "pool" because the State has not sought appellate review of the order entered by Judge D. B. Herring, Jr., in Superior Court, Durham County, on 22 December 1992, requiring that defendant be resentenced. The decision in *State v. Smith*, 305 N.C. 691, 292 S.E.2d 264, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983), is considered as a "death-affirmed" case for purposes of proportionality review because the United States Court of Appeals for the Fourth Circuit in *Smith v. Dixon*, 14 F.3d 956 (4th Cir. 1994) has reversed the order entered by Judge W. Earl Britt in *Smith v. Dixon*, 766 F. Supp. 1370 (E.D.N.C. 1991). The decision in *State v. Williams*, 308 N.C. 47, 301 S.E.2d 335 (1983), is treated as a "life" case because defendant was sentenced to life imprisonment following the decision in *Williams v. Dixon*, 961 F.2d 448 (4th Cir. 1992). The decision in *State v. Gladden*, 315 N.C. 398, 340 S.E.2d 673, *cert. denied*, 479 U.S. 870, 93

This case involves a cold, calculated, unprovoked killing, committed for the purpose of collecting life insurance proceeds. The combined total of the insurance policies on Sergeant Clark's life, of which Bonnie Sue Clark was the beneficiary, was $130,000. Weeks prior to the 1 February 1987 killing, defendant boasted to several people that he would soon receive a large inheritance. Defendant told law enforcement officers that the insurance money was to be "ours," referring to himself and Bonnie Sue Clark.

Defendant and Bonnie Sue Clark had planned that defendant kill the victim on 31 January 1987, but defendant "chickened out" when it came time to execute the plan. The next night, defendant was in the back seat of Bonnie Sue Clark's Pontiac Sunbird when she went to pick up the victim to go to the movies. While driving through Jacksonville, defendant reached from behind the seat and stabbed Glennie Clark sixteen times with a knife defendant had earlier placed on the rear floor of the car. The three most serious wounds consisted of a wound to the chest and two to the abdominal cavity. The cause of death was the stab wound to the chest, which penetrated the heart. Bonnie Sue Clark then drove to the parking lot of the Cinema Six theater on Western Boulevard and asked defendant what to do. Defendant replied that he would hit her head against the window and when somebody came by she should tell them that someone tried to rob them. Defendant then hit Bonnie Sue Clark's head against the window, got into his car that he had earlier parked at the theater, and went home. Upon arriving at his home, he showered, changed clothes, and had a drink.

A taxicab driver noticed Bonnie Sue Clark slumped over the steering wheel; when he checked on her, he found the victim's body lying between the seats of the Sunbird. Officer J. J. Phillips of the Jacksonville Police Department arrived shortly thereafter and observed the pool of blood beneath the victim's body, and Bonnie Sue Clark, who was still slumped over the steering wheel in what later

L. Ed. 2d 166 (1986), is treated as a "life" case because defendant was sentenced to life imprisonment at the resentencing proceeding ordered by Judge George M. Fountain in Superior Court, Onslow County, on 7 December 1988. The decision in *State v. Quesinberry*, 325 N.C. 125, 381 S.E.2d 681 (1989), is treated as a "life" case because defendant was sentenced to life imprisonment at the resentencing proceeding ordered by this Court upon remand for reconsideration for possible *McKoy* error. *Quesinberry v. North Carolina*, 494 U.S. 1072, 108 L. Ed. 2d 603 (1990), *on remand*, 328 N.C. 288, 401 S.E.2d 632 (1991). The decision in *State v. Stager*, 329 N.C. 278, 406 S.E.2d 876 (1991), is treated as a "life" case because defendant was sentenced to life imprisonment at the resentencing proceeding ordered by this Court in that appeal.

We emphasize that this list is not exhaustive.

**STATE v. BACON**

[337 N.C. 66 (1994)]

proved to be a faked robbery. Although the victim's estranged spouse, Bonnie Sue Clark, was living, as well as sleeping, with defendant, the love triangle was never a part of the reason for the killing. Defendant admitted that he had no romantic interest in Bonnie Sue Clark.

The jury found the only aggravating circumstance submitted— that the murder was committed for pecuniary gain. It found nine mitigating circumstances—that the initial idea for the plan that resulted in the murder was Bonnie Sue Clark's, and that defendant: had no significant history of prior criminal activity; acted under the domination of another person; had no history of violent behavior; had character, habits, mentality, propensities and activities indicating that he is unlikely to commit another violent crime; had committed the murder as the result of circumstances unlikely to recur; had established that his co-defendant, Bonnie Sue Clark, had received a life sentence; had shown remorse since his arrest; and had a family who loved him, continued to visit him while he has been incarcerated, and would continue to do so if he were sentenced to life in prison.

Defendant contends that the reported decisions involving only the "pecuniary gain" aggravating circumstance indicate that his death sentence is disproportionate. In all but two of the fourteen cases, the jury imposed a sentence of life imprisonment. The life cases are: *Stager*, 329 N.C. 278, 406 S.E.2d 876;[7] *State v. Weddington*, 329 N.C. 202, 404 S.E.2d 671 (1991); *State v. Payne*, 327 N.C. 194, 393 S.E.2d 158 (1990); *Quesinberry*, 325 N.C. 125, 381 S.E.2d 681; *State v. Locklear*, 322 N.C. 349, 368 S.E.2d 377 (1988); *State v. Murphy*, 321 N.C. 738, 365 S.E.2d 615 (1988); *State v. Hogan*, 321 N.C. 719, 365 S.E.2d 289 (1988); *State v. Baugess*, 310 N.C. 259, 311 S.E.2d 248 (1984); *State v. Woods*, 307 N.C. 213, 297 S.E.2d 574 (1982); *State v. Hawkins*, 302 N.C. 364, 275 S.E.2d 172 (1981); *State v. Moore*, 301 N.C. 262, 271 S.E.2d 242 (1980); *State v. Weimer*, 300 N.C. 642, 268 S.E.2d 216 (1980). In *State v. Benson*, 323 N.C. 318, 372 S.E.2d 541 (1988), and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983), this Court held the death sentences disproportionate.

"[T]he fact that one, two, or several juries have returned recommendations of life imprisonment in cases similar to the one under review does not automatically establish that juries have 'consistently' returned life sentences in factually similar cases." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47 (1994). This Court independently considers "the individual defendant and the nature of the crime or crimes

---

7. In *Stager* and *Quesinberry*, 325 N.C. 125, 381 S.E.2d, subsequent resentencing proceedings ordered by this Court resulted in the imposition of life sentences.

STATE v. BACON

[337 N.C. 66 (1994)]

which he has committed." *State v. Pinch*, 306 N.C. 1, 36, 292 S.E.2d 203, 229, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983), *overruled in part on other grounds, State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), and *State v. Wilson*, 322 N.C. 117, 367 S.E.2d 589 (1988). Further, the single aggravating circumstance may outweigh a number of mitigating circumstances and may be sufficient to support a death sentence.[8]

The facts and circumstances of the twelve life cases cited above distinguish them from the present case. Five involved convenience store robbery-murders. *Locklear*, 322 N.C. 349, 368 S.E.2d 377; *Hogan*, 321 N.C. 719, 365 S.E.2d 289; *Baugess*, 310 N.C. 259, 311 S.E.2d 248; *Moore*, 301 N.C. 262, 271 S.E.2d 242; *Weimer*, 300 N.C. 642, 268 S.E.2d 216. In *Murphy*, the defendant robbed and killed his victim, for whom he had done odd jobs. *Murphy*, 321 N.C. at 739, 365 S.E.2d at 616. In *Hawkins*, the defendant killed a person he had met at a fair and pocketed $60 to $80. *Hawkins*, 302 N.C. at 365, 275 S.E.2d at 173. None of these murders were as pre-planned, cold, and calculating as that in the present case.

---

8. This Court has affirmed death sentences based on four of the eleven aggravating circumstances when only one aggravating circumstance was submitted to and found by the jury. Those four aggravating circumstances are:

(1) N.C.G.S. § 15A-2000(e)(3): "The defendant had been previously convicted of a felony involving the use or threat of violence to the person." *State v. Brown*, 320 N.C. 179, 358 S.E.2d 1.

(2) N.C.G.S. § 15A-2000(e)(5): "The capital felony was committed while the defendant was engaged, or was an aider or abettor, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any homicide, robbery, rape or a sex offense, arson, burglary, kidnapping, or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb." *State v. Zuniga*, 320 N.C. 233, 357 S.E.2d 898 (1987) (while engaging in the felony of first-degree rape).

(3) N.C.G.S. § 15A-2000(e)(9): "The capital felony was especially heinous, atrocious, or cruel." *State v. Syriani*, 333 N.C. 350, 428 S.E.2d 118, *cert. denied*, ——U.S.——, 126 L. Ed. 2d 341 (1993), *reh'g denied*, —— U.S. ——, 126 L. Ed. 2d 707 (1994); *State v. Spruill*, 320 N.C. 688, 360 S.E.2d 667 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 934 (1988); *State v. Huffstetler*, 312 N.C. 92, 322 S.E.2d 110 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985); *State v. Martin*, 303 N.C. 246, 278 S.E.2d 214, *cert. denied*, 454 U.S. 933, 70 L. Ed. 2d 240, *reh'g denied*, 454 U.S. 1117, 70 L. Ed. 2d 655 (1981).

(4) N.C.G.S. § 15A-2000(e)(11): "The murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons." *State v. Williams*, 305 N.C. 656, 292 S.E.2d 243, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983).

In *Payne*, the defendant consistently maintained that he had planned to shoot his wife until shortly before the gun fired, but that the gun truly did fire accidentally. *Payne*, 327 N.C. at 197, 393 S.E.2d at 159. In *Woods*, the defendant conspired with her lover to kill her husband. The lover shot the defendant's husband one morning when the husband walked out the front door to go to work. *Woods*, 307 N.C. at 216, 297 S.E.2d at 576. The jury convicted the defendant as an accessory before the fact, in contrast to the defendant in the present case, who actually perpetrated the crime. *Id.* at 217-18, 297 S.E.2d at 577. In *Stager*, the defendant shot her husband while he slept in their bed, and claimed that the gun discharged accidentally. *Stager*, 329 N.C. at 285-86, 406 S.E.2d at 880. The jury found that she committed the murder for pecuniary gain. The jury also found numerous mitigating circumstances, including that: the defendant had no significant history of prior criminal activity, like the defendant in the present case; she had no criminal record; she had reared two fine children; she was an active and helpful church member; she was gainfully employed throughout most of her adult life; she had attempted to lead a Christian life since childhood and had continued her Christian beliefs and practices since incarceration; she had cooperated with law enforcement officials in their investigation and willingly complied with all their requests; and she was remorseful, like the defendant in the present case. Although factually similar in some respects, none of these cases are characterized by the viciousness and brutality of the murder in the present case.

Defendant further contends that this case more closely resembles those in which this Court has found the death sentence disproportionate than those involving brutal, multiple killings by persons with extensive criminal records in which this Court has allowed death sentences to stand. Three were robbery-murders and involved the pecuniary gain aggravating circumstance. *State v. Benson*, 323 N.C. 318, 373 S.E.2d 517 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). One involved the course of conduct aggravating circumstance. *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds, State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). Two involved the "especially heinous, atrocious, or cruel" aggravating circumstance. *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983). One involved the circumstance that the murder was committed against a law enforcement

officer in the performance of his official duty. *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984). None are similar to the present case.

In *Benson*, the defendant confronted the victim and demanded his moneybag. The victim hesitated and the defendant fired his shotgun, striking the victim in the upper portion of both legs; the victim later died in the hospital of cardiac arrest resulting from the loss of blood from the gunshot wounds. *Benson*, 323 N.C. at 321, 372 S.E.2d at 518. This Court found the death penalty disproportionate because the defendant was convicted solely on the theory of felony murder and the evidence that he fired at the victim's legs tended to show that he intended only to rob the victim. The jury found only the pecuniary gain aggravating circumstance, but found as mitigating circumstances that defendant was under the influence of mental or emotional disturbance, as well as, like in the present case, that defendant had no significant history of prior criminal activity. *Id.* at 328, 372 S.E.2d at 522. Further, the defendant confessed and cooperated upon arrest, pleaded guilty during the trial, and acknowledged his wrongdoing before the jury. *Id.* at 328-29, 372 S.E.2d at 522-23. In the present case, by contrast, defendant planned the murder weeks prior to the killing to collect a share of the victim's insurance proceeds.

In *Young*, the defendant, who had been drinking heavily all day, suggested to two accomplices that they rob and kill the victim so they could buy more liquor. *Young*, 312 N.C. at 672-73, 325 S.E.2d at 184. In *Rogers*, the defendant mistakenly shot the victim while attempting to shoot the victim's friend, with whom he had been arguing. *Rogers*, 316 N.C. at 211, 341 S.E.2d at 718. In *Jackson*, the defendant asked the victim for a ride to get some jumper cables. The next time the victim was seen, he was dead, shot twice in the head with a small-caliber weapon at close range. *Jackson*, 309 N.C. at 46, 305 S.E.2d at 717. In' *Hill*, defendant shot a police officer at close range with the officer's own weapon. The officer had approached defendant, who was looking for a young woman in the neighborhood; defendant ran, and the officer pursued and tackled him. *Hill*, 311 N.C. at 467-68, 319 S.E.2d at 165. This Court found the death penalty disproportionate, citing "the apparent lack of motive, the apparent absence of any simultaneous offenses, and the incredibly short amount of time involved, together with the jury's finding of three mitigating circumstances tending to show defendant's lack of past criminal activity and his being gainfully employed, and the unqualified cooperation of defendant during the investigation." *Id.* at 479, 319 S.E.2d at 172. In the present case, by contrast, defendant planned to murder the victim weeks prior to the

actual crime, plotted to entice the victim to the front seat of Ms. Clark's car for the killing, stabbed the victim sixteen times, and then set the stage for a botched robbery attempt, all for half the proceeds of the victim's insurance policies. The murders in *Young, Jackson, Rogers,* and *Hill* were not coldly calculated over a lengthy period of time and viciously executed, as was the murder of Sergeant Clark.

In *Bondurant,* the defendant pointed the gun at the victim, taunted him for two or three minutes, and shot him. *Bondurant,* 309 N.C. at 677, 309 S.E.2d at 173. This Court "deem[ed] it important in amelioration of defendant's senseless act that immediately after he shot the victim, he exhibited a concern for [the victim's] life and remorse for his action by directing the driver of the automobile to the hospital." *Id.* at 694, 309 S.E.2d at 182. Defendant then entered the hospital to seek medical assistance for the victim. Further, defendant spoke with police at the hospital, confessing that he had fired the shot that killed the victim. *Id.* In the present case, by contrast, defendant stabbed the victim sixteen times, returned the car to the parking lot with the victim draped over defendant's legs, faked a robbery, returned home, showered, and had a drink, rather than securing immediate medical attention for the victim.

In *Stokes,* the defendant and two accomplices planned to rob the victim's warehouse. During the robbery one of the three severely beat the victim about the head, killing him. *Stokes,* 319 N.C. at 3, 352 S.E.2d at 654. This Court deemed it important that the defendant was only seventeen. The jury found, in contrast to the present case, that defendant suffered from an impaired capacity to appreciate the criminality of his conduct, that he was under the influence of a mental or emotional disturbance at the time of the murder, and that his age at the time of the crime had mitigating value.[9] *Stokes* involved a robbery-murder. The defendant was convicted on the theory of felony murder; there was virtually no evidence of premeditation and deliberation, in contrast to the present case, and no evidence that the defendant was the ringleader or deserved a death sentence any more than an older accomplice who received a life sentence. *Id.* at 21, 24, 352 S.E.2d at 664, 666. Both of these defendants carried sticks to the scene of the crime and struck the blows that resulted in the victim's death. "Both committed the same crime in the same manner." *Id.* at 21, 352 S.E.2d at 663. By contrast, defendant hid a knife on the floor in the rear of Ms. Clark's car. Ms. Clark got into the driver's seat; defendant was in

9. Because the jury found the existence of "one or more" mitigating circumstances, the Court assumed their existence for proportionality review. *Id.* at 21, 352 S.E.2d at 664.

the back seat. While riding around, defendant reached down to the floorboard, picked up the knife, and proceeded to stab the victim sixteen times. Ms. Clark then drove to the theater, where she and defendant staged the fake robbery. Although Ms. Clark received only a life sentence, she and defendant did not commit "the same crime in the same manner."

Defendant contends there are two other cases in the pool in which the jury recommended a life sentence which are most similar to the present case, that of his co-defendant, Bonnie Sue Clark, *State v. Clark*, 324 N.C. 146, 377 S.E.2d 54 (1989), and *State v. Gladden*, 315 N.C. 398, 340 S.E.2d 673, *cert. denied*, 479 U.S. 871, 93 L. Ed. 2d 166 (1986).

In *Gladden*, the defendant was having an affair with the victim's wife at the time of the murder. Six months prior to the actual murder, defendant attempted to hire someone to kill the victim. When this failed, defendant planned and participated in a scheme with the victim's wife whereby they lured the victim to a secluded area by telling the victim that his wife's car had broken down. There the defendant slashed the victim's throat, shot him twice, dragged him into a ditch, and then shot him two more times in the face. After the attack, the defendant went back to his apartment, changed clothes, and returned to the scene. He dragged the victim's body into the woods and took the victim's wallet and watch to make it appear as though a robbery had occurred. *Gladden*, 315 N.C. at 404-06, 340 S.E.2d at 677-79.

While *Gladden* is similar to the present case—for example, both victims were Marine noncommissioned officers, and both defendants planned the murders, in advance, with their lovers—the distinguishing circumstance is that the defendant in *Gladden*, unlike defendant here, did not commit the murder for pecuniary gain.[10] Rather, he was apparently motivated by reports of continuing physical abuse against his lover by her husband and by threats by her husband that he would kill both his wife and the defendant.

Defendant contends that the same essential facts as those in the present case resulted in a sentence of life imprisonment for Ms. Clark. In a similar situation, defendant contends, this Court found a death sentence disproportionate. *Stokes*, 319 N.C. 1, 352 S.E.2d 653. Although defendant actually inflicted the blows which resulted in

---

10. At the resentencing proceeding granted the defendant in *Gladden* because his trial counsel had rendered him ineffective assistance, the jury failed unanimously to find the existence of *any* aggravating circumstance and recommended a sentence of life imprisonment.

Sergeant Clark's death, Ms. Clark initially suggested the killing and was a full participant in the events leading up to Sergeant Clark's death, having lured him from the safety of his apartment into her vehicle, driven the automobile during and after the stabbing, and attempted to divert law enforcement officers from the truth after the discovery of Sergeant Clark's body. The sentencing jury found that defendant "acted under the domination" of Ms. Clark, and that the "initial idea for the plan that resulted in the death of the deceased was that of the co-defendant, Bonnie Sue Clark." These facts, defendant contends, demonstrate the excessiveness of his death sentence.

Defendant, however, was the only one who wielded the knife, and he, not Ms. Clark, brutally stabbed Sergeant Clark sixteen times. Further, the *Clark* jury found Ms. Clark guilty as an aider and abettor, whereas defendant was found guilty on the basis of malice, premeditation, and deliberation as the actual wielder of the knife. The *Clark* jury found that the murder was "especially heinous, atrocious, or cruel," but refused to find that the murder was committed for pecuniary gain. That jury found, unlike with defendant here, that Ms. Clark was mentally or emotionally disturbed at the time the crime was committed. Further, it found that all of Sergeant Clark's wounds were inflicted by Bacon, the defendant here; that Ms. Clark made an early confession about her involvement in the capital felony; that she was the mother of two small children and had the primary responsibility for rearing them; that she was vulnerable due to her sense of hopelessness and dependency; and that her involvement in the stabbing was the product of long-term abuse and emotional disturbance. Unlike Ms. Clark, defendant Bacon had no mitigating reasons for stabbing Sergeant Clark—a man he had never even met before the night of Sergeant Clark's death. These facts manifestly distinguish the conduct of the co-participants and justify their disparate sentences.

There is one very similar case in the pool in which the jury recommended a sentence of death after finding a single aggravating circumstance—*State v. Syriani*, 333 N.C. 350, 428 S.E.2d 118, *cert. denied*, —— U.S. ——, 126 L. Ed. 2d 341 (1993), *reh'g denied*, —— U.S. ——, 126 L. Ed. 2d 707 (1994). In *Syriani*, the defendant accosted his estranged wife and stabbed her to death. Following the assault, the defendant walked calmly back to his van and drove to a nearby fire station, where he told a fireman he needed medical attention because he had been in a fight. *Syriani*, 333 N.C. at 359, 364, 428 S.E.2d at 121-22, 124. The jury found as the single aggravating circumstance that the murder was "especially heinous, atrocious, or cruel." The jury

also found eight mitigating circumstances—that the crime was committed while the defendant was under the influence of mental or emotional disturbance; that he understood the severity of his conduct; that he had, since his incarceration, demonstrated an ability to abide by lawful authority; that he had a history of good work habits; that he had a history of being a good family provider; that he had been a person of good character or reputation in the community in which he lived; that he was reared in a different culture; and that he was aggravated by events following the issuance of an *ex parte* domestic violence order. *Id.* at 401, 428 S.E.2d at 146. This Court concluded that the sentence of death was not disproportionate based on evidence similar to that in the present case, including the nature of the killing, the lack of remorse or pity, and the defendant's cool actions after the murder. *Id.* at 401-06, 428 S.E.2d at 146-49. Further, in the present case defendant pre-planned and coldly calculated the brutal assault, all for half of the victim's rather meager insurance proceeds. Defendant was not found to be under the influence of a mental or emotional disturbance; the anger he felt at the racial slurs directed toward him by the victim does not rise to the level of the distress attendant upon the disintegration of the defendant's marriage in *Syriani*.

We conclude that the circumstances of *Gladden*, *Clark*, and the numerous cases cited by defendant in which the jury returned a life sentence, or in which this Court held the death sentences disproportionate, distinguish those cases from the present case; *Syriani* is the case in the pool most comparable to the present case. In light of *Syriani*, and of the especially calculating, vicious, and brutal nature of the offense here, we cannot say that the death sentence in this case was excessive or disproportionate, considering both the crime and the defendant.

We hold that the defendant received a fair sentencing proceeding, free of prejudicial error. In comparing this case to similar cases in which the death penalty was imposed, and in considering both the crime and the defendant, we cannot hold as a matter of law that the death penalty was disproportionate or excessive. *Robbins*, 319 N.C. at 529, 356 S.E.2d at 317.

NO ERROR.

Justice PARKER did not participate in the consideration or decision of this case.

**STATE v. BACON**

[337 N.C. 66 (1994)]

Justice MEYER concurring in result.

I concur only in the result reached by the majority. I do not concur in the majority's new definition of the pool of cases employed by this Court in its proportionality review in death cases. The majority has added a category of cases not heretofore included, that is, cases in which this Court has not reviewed either or both the guilt-innocence phase or the capital sentencing proceeding—most of which not only have not been reported and thus not tracked in the citators (Shepard's, Insta-Cite, Auto-Cite, etc.), but which also, in some instances, might not have even been transcribed by the trial court reporter.

In *State v. Goodman*, 298 N.C. 1, 257 S.E.2d 569 (1979), this Court noted that it would not engage in proportionality review until and unless it first finds both phases of a defendant's trial free from prejudicial error. The Court noted that "[o]nly then can we have before us the true decision of the jury to which we feel great deference should be accorded." *Id.* at 35, 257 S.E.2d at 590.

In *State v. Williams*, 308 N.C. 47, 301 S.E.2d 335, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983), this Court defined the manner in which it would conduct proportionality review and defined the pool of cases it would consider in conducting such review. We first established the appropriate pool.

> In comparing "similar cases" for purposes of proportionality review, we use as a pool for comparison purposes *all cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and *reviewed on direct appeal by this Court* and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

*Id.* at 79, 301 S.E.2d at 355 (second emphasis added). Immediately thereafter, in *State v. Jackson*, we clarified our *Williams* holding and further limited the pool of cases to those cases in which this Court has found no error in both the guilt-innocence and sentencing phases. *State v. Jackson*, 309 N.C. 26, 45, 305 S.E.2d 703, 717 (1983).

Until today, it has been quite clear to everyone that post-trial review by this Court of the trial court's final disposition of the case was the essential factor that qualified a case for inclusion in the pool. Under the majority's decision in this case, cases in which there is a

new sentencing hearing as a result of the direct appeal or post-conviction relief, in which the defendant receives a life sentence will be included in the pool, although there has been no review whatever by this Court of the new sentencing proceeding. The same is true for cases in which new trials are ordered and life sentences are entered automatically because either (1) no aggravating circumstance is found, or (2) the jury fails to find that the aggravating circumstance or circumstances found are sufficient, when compared to the mitigating circumstances found, to call for the imposition of the death penalty. In such cases, there will have been no capital sentencing proceeding, and furthermore, there will have been no review whatsoever of the guilt-innocence phase.

In such cases as these, there is no review of the new and final proceeding by this Court, and no record on appeal has been made up; indeed, the transcript of the proceeding may not have even been typed, and, of course, there is no formal reporting of the results in the citators. Such cases are of little or no value in performing a proper proportionality review.

The majority has, by its opinion in this case, included in the pool this new and totally unreliable category of cases that will make the pool more unwieldy, more unreliable, and even more difficult to use.

The problems with the new category of cases can be illustrated by reference to a particular case, specifically included in the pool by the majority opinion, which has a remarkably similar factual situation to the case at bar. The case is *State v. Gladden*, 315 N.C. 398, 340 S.E.2d 673, *cert. denied*, 479 U.S. 870, 93 L. Ed. 2d 166 (1986), in which the defendant engaged in the brutal killing of a Marine sergeant. The jurors in the sentencing phase of Gladden's original trial found the only submitted aggravating circumstance, that the capital felony was "especially heinous, atrocious, or cruel." N.C.G.S. § 15A-2000(e)(9) (1988). The jurors found no mitigating circumstances and returned a recommendation that the defendant be sentenced to death.

This Court affirmed Gladden's death sentence. However, subsequent to the final disposition of Gladden's direct appeal by this Court and the denial of his petition for certiorari by the United States Supreme Court, 315 N.C. 398, 340 S.E.2d 673, *cert. denied*, 479 U.S. 871, 93 L. Ed. 2d 166, Gladden filed a motion for appropriate relief in the Superior Court, Onslow County, alleging, *inter alia*, ineffective assistance of his trial counsel during the sentencing phase of his orig-

inal trial. After an evidentiary hearing, the hearing judge found that Gladden's trial counsel, during the sentencing phase of the trial, was deficient to the extent that it prejudiced Gladden so seriously as to deprive him of a fair sentencing hearing and, on 7 December 1988, ordered a new capital sentencing proceeding. At the resentencing, the jury, having failed unanimously to find the existence of any aggravating circumstance, was not permitted to consider the death penalty and, as instructed, recommended a sentence of life imprisonment. On 2 November 1989, Gladden was sentenced to life imprisonment. Because the motion for appropriate relief was filed and disposed of in the Trial Division and was not the subject of any appeal or petition, the case did not again reach the Appellate Division, and the record of the filing and disposition of the motion does not appear in the published subsequent history of the case. This would be true even if the resentencing jury had been allowed to consider the death penalty but failed to recommend it. Having verified that Gladden's death sentence, previously affirmed by this Court, is, by reason of a post-conviction matter, no longer in effect, that he has subsequently been resentenced to life imprisonment, and that the resentencing proceeding has not been reviewed by this Court, *State v. Gladden* should not be included in our pool of cases for purposes of proportionality review.

This Court has not heretofore determined what treatment cases such as *Gladden* should receive in regard to their status in the pool of cases for proportionality review. If this Court affirms a death sentence and the United States Supreme Court denies a petition for certiorari in the case, it is no longer tracked in the citators unless, for some reason, it is again reviewed by a court in our Appellate Division or in the federal courts. If a subsequent motion for appropriate relief is filed and is either denied or allowed in our Trial Division, any number of possible results may follow, some of which would bring the case back to our Appellate Division but some of which, such as was the case with *Gladden*, would not. When the latter occurs and the subsequent history is not tracked in the citators, this Court is not aware of the results unless it makes an investigation of the matter,[1]

1. This Court has initiated procedures to discover such cases at the earliest possible time. We review on a monthly basis the list of inmates on death row to determine if an inmate has been removed. If an inmate has been removed, we investigate to determine whether it is by reason of some post-conviction relief granted in the Trial Division. If so, then the case is tracked for further development, and the case is deleted from the proportionality pool. We have also requested that the Warden of Central Prison (where all the death row inmates are housed) inform us when such an occur-

which, while difficult for the Court, is far more difficult for practicing attorneys unfamiliar with the case. Arguably, for this reason alone, cases like *Gladden* should not be included in our pool of cases for proportionality review purposes.

There are, however, other good and valid reasons not to include such cases in the pool. For a variety of reasons, retrials and new sentencing hearings are not mirror images of the original proceedings and frequently bear little resemblance to them. Witness dispersion and unavailability, a victim's reluctance or unwillingness to relive the experience of the trial, fading memories, lost evidence, and missing transcripts are just a few of the factors that account for the differences, particularly where the new trial or sentencing hearing occurs long and, in some cases, many years after the original trial. The evidence is often not the same and is often weaker.

The record in this very case demonstrates the point. Many of the State's witnesses in the first trial did not testify in the resentencing. Defendant procured substantial expert psychiatric testimony that was not presented at the first trial. Defendant presented a different picture of himself—one scarred by his poor upbringing in a dysfunctional family, a far different picture than he presented at the original trial. Though, here, in spite of these differences, the jury again recommended a sentence of death, the point is that different evidence was presented.

Defendant argues that the administrative problems can be overcome by our requiring the Clerk of the Superior Court to furnish this Court a copy of the sentencing issues and recommendations and the judgment entered in each capital sentencing hearing from which no appeal occurs. While this could provide us with a record of the aggravating and mitigating circumstances submitted and those found, such a record is entirely inadequate for a proper proportionality review. Simply knowing the circumstances submitted and those found does not explain the interplay between the various bits of evidence considered, the relative strengths and weaknesses of the evidence in support of each circumstance, or the weight a juror or jurors might give to each point or other aspects of the defendant's character in reaching a final recommendation.

This Court does not simply compare aggravating and mitigating circumstances presented and found with those presented and found

---

rence comes to his knowledge. Further, we have requested that the Clerks of Court in our one hundred counties inform us whenever post-conviction relief is granted in the Trial Division changing the status of a death row inmate.

in other cases in the pool. In *State v. Williams*, 308 N.C. at 81, 301 S.E.2d at 356, we specifically indicated that this Court would "rely upon [its] own case reports" and review all the material, including the complete record and the briefs of the parties, in making comparisons, rather than merely review a specified number of identity points.

I consider it the better course, when engaging in a proportionality review following a determination of no error in both phases of a death case, to exclude from our pool of cases any case in which an earlier death-affirmed case has undergone a new trial or new sentencing hearing that has not been reviewed by this Court. This rule should apply whether the resentencing jury was or was not permitted to consider the sentence of death.

I would state our rule with regard to all similarly situated cases thusly: Capitally tried cases in which a new trial or a new capital sentencing proceeding has been ordered on direct review or on collateral attack, such as *habeas corpus* or motions for appropriate relief in state or federal court following review on direct appeal by this Court, are removed from the pool for purposes of proportionality review. If the new capital sentencing proceeding results in a sentence of death, the case does not return to the pool until it has been reviewed by this Court, and the new proceeding has been found to be without error. If the majority feels that returning only the death cases to the pool skews the pool, then the solution would be not to return such cases to the pool regardless of the outcome of the final proceeding. The pool will always consist of more than enough cases to fulfill its purpose without these cases.

Much of the difficulty in performing our proportionality review in capital cases results from the fact that the pool is constantly growing and constantly changing, with cases leaving and returning to the pool depending on the results of post-conviction attacks in state and federal trial courts and review of those decisions on appeal. Because the pool is constantly changing by reason of cases leaving and reentering, it is not as dependable and reliable a yardstick for determining the proportionality of a death sentence as originally envisioned. Today's majority's decision and its redefinition of the pool exacerbates the problem. The majority may have created an undesirable, if not completely unworkable, administrative and procedural nightmare not only for the Court, but also for the attorneys who handle appeals in capital cases.

**STATE v. BACON**

[337 N.C. 66 (1994)]

Chief Justice EXUM dissenting.

I agree with the majority's statement of the legal principles which this Court follows in conducting its proportionality review, including the majority's definition of the proportionality pool. Believing, however, that the death sentence is excessive and disproportionate when compared with sentences imposed in similar cases, I dissent from the majority's contrary conclusion and, pursuant to N.C.G.S. § 15A-2000(d)(2), vote to impose a sentence of life imprisonment.

At defendant's second sentencing hearing, the State offered evidence, in part consisting of defendant's testimony at his former trial which, in substance tended to show as follows:

Bonnie Clark wanted her estranged husband, Marine Corps Sergeant Glennie Clark, dead, apparently for the purpose of collecting certain insurance proceeds as beneficiary of a Serviceman's Group Life Insurance policy insuring his life. Bonnie Clark and defendant "were boyfriend and girlfriend," sharing a bedroom at the Shadowbrook residence; although Bacon contended that he never became romantically involved with Bonnie Clark after moving into the same apartment and sharing a bedroom with her. Bonnie Clark complained to defendant concerning her estranged husband's drinking and abuse of both her and the children, but defendant told her that he didn't want to hear about these troubles. Bonnie Clark told the defendant, "I wish Glenn was dead." The defendant was not sure whether to take her seriously, but after she continued to insist and to inquire regarding whether defendant had found anyone to murder her husband, defendant concluded that she was serious about having him killed.

Eventually defendant told Bonnie Clark that he would kill her husband. Plans were made between the two for the murder to take place on Saturday, 31 January 1987. Bonnie Clark, as she had agreed to do, lured Glennie Clark to the designated location near a theater; but defendant, becoming afraid, refused to take part.

Bonnie Clark and defendant again made plans to meet with Glennie Clark on Sunday, 1 February 1987, to discuss the conflict in the house created by Glennie Clark's repeated telephone calls in which he gave defendant the first degree and called him names. Defendant placed a knife in his coat pocket. After he and Bonnie Clark got in the car, defendant threw the weapon onto the floor in the back seat of the car. Bonnie Clark drove the car to Glennie Clark's home on the Camp

Lejeune base. As she walked to the door, defendant got into the back seat of the car. Bonnie Clark returned to the driver's seat; Glennie Clark occupied the front passenger seat, and defendant sat in the rear. Neither Bonnie Clark nor defendant intended to kill Glennie Clark on this occasion.

When Glennie Clark entered the vehicle, he pointed to defendant and asked "what's this shit?" At that point Bonnie Clark introduced her husband to defendant, the two having never met before. Bonnie Clark then drove off. Glennie Clark became angry and called defendant "a nigger." Glennie Clark continued to yell and turned toward the defendant. The defendant bent down, picked up the knife and stabbed Glennie Clark, who then put his arm around defendant's neck. Defendant continued to stab Glennie Clark until he was dead.

Bonnie Clark then drove through Jacksonville, wondering what to do. Defendant replied that they should stop the car at a theater where he would strike her on the head to make it appear as though she and Glennie Clark had been attacked. Defendant did this and left the scene.

Defendant's evidence tended to show as follows:

Defendant was a good high school student in Ayer, Massachusetts, where he participated in high school athletics and graduated in 1979. During his childhood and adolescence he lived with his mother, Elizabeth Bacon, and his father, Robert Bacon, Sr. He was described by friends and family members as a pleasant individual who was "intelligent" and who "never gave any trouble." He was popular in school, seemed concerned about other people and was generally admired by his teachers and classmates. He moved to North Carolina in December, 1985 where he obtained work with the Kirby vacuum cleaner company in Jacksonville. He met Bonnie Clark through work.

Defendant was of "average intelligence" with "a personality disorder with impulsivity, immaturity, and a schizoid kind of feature." According to Dr. Billy Royal, a psychiatrist, the murder resulted from defendant's trying to serve Bonnie Clark's psychological needs. Dr. Royal testified that "Mr. Bacon had a history . . . of becoming involved [with] people that were in need of assistance" and tried "to help rescue Mrs. Clark from her reported abuse by her husband." In Dr. Royal's opinion, defendant's personality disorder would probably not have caused him any legal problems had he not become involved with someone like Bonnie Clark. Defendant's psychological makeup

"dovetailed" with Bonnie Clark's needs in a way "that resulted in [Glennie Clark's] death." In Dr. Royal's opinion at the time of the murder "the racial slurs directed at defendant by Glennie Clark resulted in [defendant's losing] control." Dr. Royal testified that defendant's act in killing Glennie Clark was "primarily an impulsive act" and that at the time of the killing defendant's capacity to appreciate the criminality of his act or to conform his conduct to the law was impaired and defendant was under the influence of a mental or emotional disturbance.

The sentencing jury answered the aggravating and mitigating circumstances as set out in the majority opinion. To summarize, the jury found only one aggravating circumstance—the murder was committed for pecuniary gain. It found two statutory mitigating circumstances—defendant had no significant history of prior criminal activity and the murder was committed while defendant was under the domination of another person. It found the following non-statutory mitigating circumstances: defendant has no history of violent behavior; defendant is unlikely to commit another violent crime; defendant's criminal conduct was the result of circumstances unlikely to recur; the initial plan that resulted in the deceased's death was that of Bonnie Clark; Bonnie Clark was convicted of the same crime as defendant and was given a life sentence; defendant has shown remorse since his arrest; defendant's family loved him, has visited him in prison and will continue to visit him if he is sentenced to life imprisonment.

When the Court conducts its proportionality review, as the majority correctly states, it compares the case at bar with other similar cases in the pool, considering both the crimes committed and the defendants in this and the other cases. *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985).

If, after making such a comparison, we find that juries have consistently been returning death sentences in the similar cases, then we will have a strong basis for concluding that a death sentence in the case under review is not excessive or disproportionate. On the other hand if we find that juries have consistently been returning life sentences in the similar cases, we will have a strong basis for concluding that a death sentence in the case under review is excessive or disproportionate.

*Id.* In *State v. Brown*, 320 N.C. 179, 220, 358 S.E.2d 1, 28 (1987), we compared the crime and defendant "with the crime and the defendant in cases with similar facts, including cases in which the same aggravating circumstance was found." We also compared them "to cases in which the Court has affirmed a sentence of death in order to determine whether this case 'rise[s] to the level of those murders in which we have approved the death sentence upon proportionality review.'" In *State v. Price*, 326 N.C. 56, 95-96, 388 S.E.2d 84, 107 (1990), we stated:

> It is useful in proportionality review to compare the case under scrutiny to three clusters of cases in the pool—those cases resulting in sentences of life imprisonment in which the same aggravating circumstances occur, those "death affirmed" cases in which the same aggravating circumstances occurred, and those cases in which this Court has found the death sentence disproportionate.

As the majority notes, there are 14 cases in the proportionality pool in which pecuniary gain was the only aggravating circumstance. *State v. Stager*, 329 N.C. 278, 406 S.E.2d 876 (1991)[1]; *State v. Weddington*, 329 N.C. 202, 404 S.E.2d 671 (1991); *State v. Payne*, 327 N.C. 194, 393 S.E.2d 158 (1990); *State v. Quesinberry*, 325 N.C. 125, 381 S.E.2d 681 (1991)[2]; *State v. Locklear*, 322 N.C. 349, 368 S.E.2d 377 (1988); *State v. Murphy*, 321 N.C. 738, 365 S.E.2d 615 (1988); *State v. Benson*, 323 N.C. 318, 372 S.E.2d 541 (1988); *State v. Hogan*, 321 N.C. 719, 365 S.E.2d 289 (1988); *State v. Baugess*, 310 N.C. 259, 311 S.E.2d 248 (1984); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983); *State v. Woods*, 307 N.C. 213, 297 S.E.2d 574 (1982); *State v. Hawkins*, 302 N.C. 364, 275 S.E.2d 172 (1981); *State v. Moore*, 301 N.C. 262, 271 S.E.2d 242 (1980); *State v. Weimer*, 300 N.C. 642, 268 S.E.2d 216 (1980).

In all of these cases except *Benson* and *Jackson* juries have recommended life imprisonment. In both *Benson* and *Jackson*, this Court determined that death sentences were disproportionate and imposed sentences of life imprisonment.

---

1. The life sentence was imposed by the jury at a resentencing proceeding ordered by this Court because of *McKoy* error in the initial capital sentencing proceeding. *State v. Stager*, No. 93CRS03391, Superior Court, Chatham County, 12 October 1993.

2. The life sentence was imposed at a resentencing proceeding ordered by this Court because of *McKoy* error in the initial capital sentencing proceeding. *State v. Quesinberry*, No. 84CRS8304, Superior Court, Randolph County, 3 December 1991.

STATE v. BACON

[337 N.C. 66 (1994)]

In two of the cases in the pool, *State v. Woods*, 307 N.C. 213, 297 S.E.2d 574, and *State v. Payne*, 327 N.C. 194, 394 S.E.2d 158, the defendants, like Bacon and Clark, killed their spouses for insurance proceeds. Both sentencing juries recommended life imprisonment after finding the single aggravating circumstance that the defendant had killed for pecuniary gain. In *Payne*, the defendant killed his wife for the insurance benefits. In *Woods*, a lovers' triangle case similar to *Clark* and *Bacon*, the defendant offered to pay her lover a portion of the proceeds of insurance on her husband's life if her lover would kill him. The defendant was not present when her husband was shot, but she had actively aided in setting up the murder, unlocking doors at night in order to facilitate her confederate's entry.

In both *Jackson* and *Benson* the Court determined that the death sentences were disproportionate and imposed sentences of life imprisonment. In *Jackson* only two mitigating circumstances were submitted to the sentencing jury: that the defendant had no significant history of prior criminal activity and "any other circumstance or circumstances arising from the evidence . . . deem[ed] to have mitigating value." A chief reason this Court held the death sentence to be disproportionate in *Benson* was that, in comparison to *Jackson*, the sentencing jury in *Benson* found considerably more mitigating circumstances: that the defendant had no significant history of prior criminal activity; that he was under the influence of mental or emotional disturbance; that he confessed and cooperated upon arrest; that he voluntarily consented to a search of his motel room, car, home, and storage bin; and that he was abandoned at an early age by his natural mother. 323 N.C. at 328, 372 S.E.2d at 522-23.

In the case before us, as in *Benson*, the sentencing jury found significantly more mitigating circumstances than did the jury in *Jackson*. These mitigating circumstances establish that the murder of Glennie Clark was an act not in keeping with defendant's past history, character and reputation and that he would not likely repeat such an act. Unlike Benson, who acted alone, and Jackson, who forced his companions into participating in setting up his victim, defendant acted under the domination of another.

The most similar case for comparison in terms of the crime committed is, of course, the case involving defendant's accomplice, Bonnie Clark—*State v. Clark*, 324 N.C. 146, 377 S.E.2d 54 (1989). Like *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987), and *State v. Murray*, 310 N.C. 541, 313 S.E.2d 523 (1984), in which the defendants

**STATE v. BACON**

[337 N.C. 66 (1994)]

in both cases were confederates in the same crime, defendants Bacon and Clark colluded to kill Clark's husband. The sentencing juries for both Stokes and Bacon recommended sentences of death, whereas those for Murray and Clark recommended life imprisonment. In *Stokes* this Court concluded that both Murray and Stokes had committed the same crime in the same manner and were thus equally culpable. 319 N.C. at 21, 352 S.E.2d at 663. In part for this reason, we concluded Stokes' death penalty was disproportionate.

In *Clark* the jury found only one aggravating circumstance—that the murder was especially heinous, atrocious, or cruel. N.C.G.S. § 15A-2000(e)(9) (1988). The jury found the statutory mitigating circumstance that the murder had been committed while the defendant was under the influence of a mental or emotional disturbance. N.C.G.S. § 15A-2000(f)(2) (1988). In addition the jury found nine nonstatutory mitigating circumstances which concerned the defendant's vulnerability, hopelessness and dependence; her past abuse by her husband, of which her involvement in this crime was a product; her lack of a significant criminal record; her good behavior and character before the crime and during incarceration; and the unlikelihood that she would pose a danger to society were she spared the death penalty. *State v. Clark*, 324 N.C. at 169, 377 S.E.2d at 68.

In the case *sub judice* the only aggravating circumstance found by the jury was that the murder had been committed for pecuniary gain. Notably, it did not find the killing was heinous, atrocious, or cruel. Among the mitigating circumstances found by the jury were several indicating that, like his accomplice, defendant had no significant history of prior criminal activity; that he had no history of violent behavior; and that his character, habits, mentality, propensities, and activities indicated that he was unlikely to commit another violent crime. The jury also found several other mitigating circumstances reflecting defendant's past good character, diligence, and affability, and his display of remorse. For purposes of proportionality review, however, the two most significant among the mitigating circumstances found by the jury were that defendant had "acted under the domination of another person" and that "the initial idea for the plan . . . was that of the co-defendant, Bonnie Sue Clark."

The contrast between the circumstances of the same crime as perceived by both sentencing juries is striking. The *only* aggravating circumstance found by the sentencing jury in *Clark* was that the murder of defendant Clark's husband was especially heinous, atrocious, or

cruel. *State v. Clark*, 324 N.C. at 168, 377 S.E.2d at 67. The *only* aggravating circumstance found by the sentencing jury in the case *sub judice* was that the capital felony was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6) (1988). The *Clark* jury perceived the murder as exhibiting a level of brutality exceeding that normally present in first-degree murder or a murder conscienceless, pitiless, or unnecessarily torturous to the victim, or one demonstrating an unusual depravity of mind on the part of the defendant beyond that normally present in first-degree murders. *E.g.*, *State v. Stanley*, 310 N.C. 332, 312 S.E.2d 393 (1984); *State v. Pinch*, 306 N.C. 1, 292 S.E.2d 203, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982). The *Bacon* jury perceived none of these egregious circumstances, concluding only that defendant Bacon killed for pecuniary gain.

No less striking is the difference between the culpability of these two defendants as seen by their sentencing juries. According to the mitigating circumstances found by defendant Clark's sentencing jury, she was perceived as vulnerable, despairing, and dependent, the emotionally disturbed victim of domestic abuse. Defendant Bacon's sentencing jury concluded not only that Clark first proposed the murder, but also that defendant Bacon committed it under her domination.

In short, Bonnie Clark and defendant committed the same crime. Although defendant dealt the fatal blows, Clark was the instigator, planner and motivator who was actually present during and actively participated in the murder. Considering the findings of both juries, I conclude Clark and Bacon are at least equally culpable. Considering only the findings in the case before us, I would conclude Clark is more culpable.

Viewed side by side, the disparity between the perceptions of the same crime by these two sentencing juries is patent. When such inconsistent, inherently self-contradictory results lead to the sentence of life imprisonment in one case and the sentence of death in another, it is this Court's duty on proportionality review to remedy the result by setting aside the death sentence and imposing life imprisonment. "The very reason for proportionality review by *this Court* is to reduce the number of inconsistent or inherently self-contradictory results in capital cases . . . ." *State v. Stokes*, 319 N.C. at 30, 352 S.E.2d at 669 (Mitchell, J., dissenting).

That defendant's death sentence is disproportionate is reinforced by comparison with two other cases involving love triangle murders: *State v. Mahaley*, 332 N.C. 583, 423 S.E.2d 58 (1992); and *State v.*

**STATE v. BACON**

[337 N.C. 66 (1994)]

*Harris*, 333 N.C. 543, 428 S.E.2d 823 (1993). In *Mahaley*, the defendant, who was in an adjoining room while Harris, her boyfriend, and his companion strangled her husband, was sentenced to death. We vacated Mahaley's death sentence and remanded for a new sentencing proceeding. In *Harris*, the boyfriend, Harris, who actually committed the crime, was sentenced to life imprisonment. We found no error in the trial. The sentencing jury for Mahaley found the aggravating circumstances that the killing was especially heinous, atrocious, or cruel and that the offense had been committed for pecuniary gain. The sentencing jury for Harris found that the murder had been committed while the defendant was engaged in the commission of robbery with a dangerous weapon and that the murder had been committed for pecuniary gain, but it did not find that the murder was especially heinous, atrocious, or cruel. That the sentencing jury for Harris, the perpetrator, recommended life imprisonment despite finding *two* aggravating circumstances *including* pecuniary gain underscores the disproportionality of the death sentence here.

Finally, the murder in the case before us is not at the level of culpability of those murders in the cases in which this Court has affirmed sentences of death. Defendant's sentencing jury did not find any of the three aggravating circumstances most prevalent in the majority of the "death-affirmed" cases[3]—that the defendant previously had been convicted of a violent felony; that the murder was especially heinous, atrocious, or cruel; or that the murder was part of a course of conduct in which the defendant committed a violent crime against another person. *See State v. Green*, 321 N.C. 594, 365 S.E.2d 587, *cert. denied*, 488 U.S. 900, 102 L. Ed. 2d 235 (1988) (prior violent felony; course of conduct); *State v. Holden*, 321 N.C. 125, 362 S.E.2d 513 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988) (prior conviction of a violent felony); *State v. Brown*, 320 N.C. 179, 358 S.E.2d 1, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987) (prior conviction of a violent felony); *State v. Spruill*, 320 N.C. 688, 360 S.E.2d 667 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 934 (1988) (heinous, atrocious, or cruel); *State v. Robbins*, 319 N.C. 465, 356 S.E.2d 279, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987) (prior

---

3. *See State v. Artis*, 325 N.C. 278, 342, 384 S.E.2d 470, 506 (1989), *judgment vacated*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990) (heinous, atrocious, or cruel and previous conviction of a violent felony are two aggravating circumstances most prevalent in death-affirmed cases); *State v. Greene*, 324 N.C. 1, 28-29 nn.3 & 5, 376 S.E.2d 430, 446-47 nn.3 & 5 (1989), *judgment vacated*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990) (heinous, atrocious, or cruel; previous conviction of a violent felony; or course of conduct aggravating circumstance(s) found in thirty-six of thirty-seven "death-affirmed" cases).

conviction of a violent felony); *State v. Gladden*, 315 N.C. 398, 340 S.E.2d 673, *cert. denied*, 479 U.S. 871, 93 L. Ed. 2d 166 (1986) (heinous, atrocious, or cruel); *State v. Brown*, 315 N.C. 40, 337 S.E.2d 808 (1985), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986) (prior conviction of a violent felony; heinous, atrocious, or cruel); *State v. Vereen*, 312 N.C. 499, 324 S.E.2d 250, *cert. denied*, 471 U.S. 1094, 85 L. Ed. 2d 526 (1985) (course of conduct); *State v. Huffstetler*, 312 N.C. 92, 322 S.E.2d 110 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985) (heinous, atrocious, or cruel); *State v. Noland*, 312 N.C. 1, 320 S.E.2d 642 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369, *reh'g denied*, 471 U.S. 1050, 85 L. Ed. 2d 342 (1985) (course of conduct); *State v. Gardner*, 311 N.C. 489, 319 S.E.2d 591 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985) (course of conduct); *State v. Boyd*, 311 N.C. 408, 319 S.E.2d 189 (1984), *cert. denied*, 471 U.S. 1030, 85 L. Ed. 2d 324 (1985) (prior conviction of a violent felony; heinous, atrocious, or cruel); *State v. Maynard*, 311 N.C. 1, 316 S.E.2d 197, *cert. denied*, 469 U.S. 963, 83 L. Ed. 2d 299 (1984) (heinous, atrocious, or cruel); *State v. Lawson*, 310 N.C. 632, 314 S.E.2d 493 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985) (course of conduct); *State v. Oliver*, 309 N.C. 326, 307 S.E.2d 304 (1983) (heinous, atrocious, or cruel); *State v. Craig and State v. Anthony*, 308 N.C. 446, 302 S.E.2d 740, *cert. denied*, 464 U.S. 908, 78 L. Ed. 2d 247 (1983) (heinous, atrocious, or cruel; course of conduct); *State v. Williams*, 308 N.C. 47, 301 S.E.2d 335, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983) (heinous, atrocious, or cruel); *State v. McDougall*, 308 N.C. 1, 301 S.E.2d 308, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983) (prior conviction of a violent felony; heinous, atrocious, or cruel; course of conduct); *State v. Brown*, 306 N.C. 151, 293 S.E.2d 569, *cert. denied*, 459 U.S. 1080, 74 L. Ed. 2d 642 (1982) (heinous, atrocious, or cruel); *State v. Pinch*, 306 N.C. 1, 292 S.E.2d 203, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983) (heinous, atrocious, or cruel; course of conduct); *State v. Smith*, 305 N.C. 691, 292 S.E.2d 264, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982) (heinous, atrocious, or cruel); *State v. Williams*, 305 N.C. 656, 292 S.E.2d 243, *cert. denied*, *Smith v. North Carolina*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, *Williams v. North Carolina*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983) (course of conduct); *State v. Taylor*, 304 N.C. 249, 283 S.E.2d 761 (1981), *cert. denied*, 463 U.S. 1213, 77 L. Ed. 2d 1398, *reh'g denied*, 463 U.S. 1249, 77 L. Ed. 2d 1456 (1983) (prior conviction of a violent felony); *State v. Rook*, 304 N.C. 201, 283 S.E.2d 732 (1981), *cert. denied*, 455 U.S. 1038, 72

L. Ed. 2d 155 (1982) (heinous, atrocious, or cruel); *State v. Hutchins,* 303 N.C. 321, 279 S.E.2d 788 (1981) (course of conduct); *State v. Martin,* 303 N.C. 246, 278 S.E.2d 214, *cert. denied,* 454 U.S. 933, 70 L. Ed. 2d 240, *reh'g denied,* 454 U.S. 1117, 70 L. Ed. 2d 655 (1981) (heinous, atrocious, or cruel); *State v. Barfield,* 298 N.C. 306, 259 S.E.2d 510 (1979), *cert. denied,* 448 U.S. 907, 65 L. Ed. 2d 1137, *reh'g denied,* 448 U.S. 918, 65 L. Ed. 2d 1181 (1980) (heinous, atrocious, or cruel). Nor was this an offense involving a sexual assault or other violent felony, *e.g., State v. Zuniga,* 320 N.C. 233, 357 S.E.2d 898, *cert. denied,* 484 U.S. 959, 98 L. Ed. 2d 384 (1987); *State v. Bare,* 309 N.C. 122, 305 S.E.2d 513 (1983); nor did it involve the infliction of serious injury or the murder of more than one victim, *e.g., State v. Vereen,* 312 N.C. 499, 324 S.E.2d 250, *cert. denied,* 471 U.S. 1094, 85 L. Ed. 2d 526 (1985); *State v. McDougall,* 308 N.C. 1, 301 S.E.2d 308, *cert. denied,* 464 U.S. 865, 78 L. Ed. 2d 173 (1983); nor was it effectuated in order to avoid lawful arrest, *e.g., State v. Holden,* 321 N.C. 125, 362 S.E.2d 513 (1987), *cert. denied,* 486 U.S. 1061, 100 L. Ed. 2d 935 (1988).

From every perspective the instant case is a misfit among similar cases in the proportionality pool. First, it is the only case in which the death penalty has been ultimately imposed where the sole aggravating circumstance found was the motive of pecuniary gain. Second, it is the only case in the proportionality pool in which a defendant determined by the sentencing jury to have been under the domination of a confederate was condemned to death while the confederate was sentenced to life imprisonment. Third, defendant Bacon, who killed at the behest and under the inspiration, direction, and domination of another and whose sentencing jury found two statutory and seven non-statutory mitigating circumstances, is less culpable than Benson and Jackson, whose death sentences were determined disproportionate by this Court. Finally, the murder here in terms of both the crime and the defendant does not rise to the level of culpability present in the cases in which this Court has determined the death penalty to be not disproportionate. For all these reasons, I conclude defendant's sentence of death is disproportionate and vote to vacate this sentence and impose a sentence of life imprisonment.

Justice FRYE joins in this dissenting opinion.